## ASHER ROSSITER AND CHARLES G. WICKER *v*. JOHN CHESTER AND HENRY T. STRINGHAM.

The steamer Missouri, being a new and seaworthy boat, and having on board passengers and a cargo of goods, on a voyage from Buffalo to Chicago, encountered a very severe gale on Lake Huron. She was in great danger of perishing, from the violence of the wind and the roughness of the waves. After long struggling with the tempest, the master and crew agreed that it was necessary to lighten her, in order to save her with her freight and passengers. Accordingly, a quantity of goods were, for that purpose, thrown overboard by the crew. The boat was saved, though much injured, and returned to Detroit in safety, with the residue of her cargo. *Held,* that these facts would constitute a proper case, under the *maritime law,* for general average.

The maritime law is not in force over the Lakes; or, in other words, they are not subject to admiralty jurisdiction, which is restricted to the open sea, and to waters navigable therefrom as far as the tide ebbs and flows.*

The doctrine of general average is known only to the maritime law, and cannot be enforced in a court of common law jurisdiction.

Freight *pro rata itineris* is due, when the ship, by inevitable necessity, is forced into a port short of her destination, and is unable to prosecute the voyage, and the goods are there *voluntarily accepted* by the owner.

The owner of goods was deemed to have *voluntarily accepted* them at the intermediate port, when, knowing that the voyage had been abandoned, its further prosecution having become impossible, or extremely hazardous, he there demanded his goods from the agents of the forwarders, with whom they were stored, tendering payment of their charges for storage, and brought replevin to recover possession, on the refusal of such agents to deliver them.

THIS was an action of replevin to recover possession of certain goods, wares and merchandize, tried in Wayne Circuit Court, at the November term, 1841, before the Hon. GEO. MORELL, Presiding Judge, who reserved the

---

* An act of Congress, approved February 26, 1845, entitled "An act extending the jurisdiction of the District Courts to certain cases upon the lakes and navigable waters connecting the same," extended the maritime law of the United States over the lakes, with certain restrictions and limitations therein mentioned.

questions arising upon the facts found by the special verdict, for the opinion of this Court thereon.

The jury found specially, "that the steamer Missouri, Captain Thomas Wilkins, master, was regularly enrolled and licensed for the purpose of carrying on domestic trade between the port of Buffalo, on Lake Erie, in New York, and the port of Chicago, on Lake Michigan, in Illinois, and intermediate places, and was employed in that business in the year 1840, and before and since.

" That the plaintiffs had shipped from the city of New York, certain goods, wares and merchandize, to be forwarded by the route of the Erie Canal and the Lakes, to Chicago, on Lake Michigan. The goods were to be delivered at the latter place. In the month of October, 1840, they were shipped at Buffalo, on the Missouri. The bill of lading, and the contract with the forwarders at New York, contained an exception in the ordinary form, ' dangers of the lakes excepted.' This is generally, and almost universally, a part of the contract for the forwarding of goods by the Lakes.

" That the Missouri was a new boat, and *seaworthy.* On her way up, with the goods of the plaintiffs and others on board, in Lake Huron, on or about the 23d day of October, she encountered a very severe gale. She was in danger of perishing, from the violence of the wind and the roughness of the waves. After long struggling with the tempest, and being in great danger of perishing, the master and crew agreed that it was necessary to lighten the boat, in order to save her with her freight and passengers; accordingly, a quantity of goods were *thrown* overboard by the crew, in order to lighten the boat, and save her with the remainder of her freight and the passengers and crew. The boat was saved, and got back in safety to Detroit. The freight was there landed; and, as the close of navigation was at hand, and the vessel much injured, the voy-

age was abandoned.  A protest and full statement were made by the captain immediately on her return to Detroit.  The plaintiffs had notice of these facts, and that the goods were in the custody of the defendants as the agents of the forwarders and shippers.

" That the plaintiffs offered to accept the goods and to pay to the defendants their charges for storage, &c., at Detroit.  The defendants accepted and were paid these; but demanded, also, the charges and expenses for freight, &c., to Detroit; being the amount advanced on the goods at Buffalo, for canal charges, and a ratable freight to Detroit.  The defendants also insisted, that the plaintiffs should agree to be responsible for contribution towards the goods thrown overboard, and the damage to the vessel, &c. on the principle of general, or gross average.  This the plaintiffs refused; and refused to execute a general average bond, in the ordinary form, which was tendered to them, and the execution of which was demanded by the defendants as a condition precedent to the delivery of the goods.  The plaintiffs then replevied the goods in the present action."

*George C. Bates,* for the plaintiffs, admitted that the facts would have constituted a proper case for gross or general average, had they occurred at sea; but he insisted,

·1.  That general average, is known to the maritime law alone; Jac. L. D. Average; Lex. Mer. 119, 123; Lex. Mer. Am. 236; Ab. Sh. 342, 343, 344; 4 Bl. Com. 64; 1 Bac. Abr. 631; 3 Kent's Com. 233; 2 Gall. R. 475; Dunl. Adm. Pr. 57; 2 Marsh. Ins. 534, 537; and has never been recognized or enforced by courts of common law jurisdiction merely.  12 Co. Rep. 63; *Birkley* v. *Presgrave,* 1 East. 220; *Cowell* v. *Edwards,* 2 B. & P. 269, 270, 274; Marsh. Ins. 534.  If enforced or known at all, elsewhere than in courts of admiralty and maritime juris-

Rossiter *v.* Chester.

diction, it can only be in courts of equity. *Deering* v. *Earl of Winchelsea,* 2 B. & P. 274; *Craythorne* v. *Swinburne,* 14 Ves. 169 ; *Campbell* v. *Mesier,* 4 John. Ch. R. 333, 339.

2. The maritime law applies only to matters arising at sea, and on waters navigable from the sea as far as the tide ebbs and flows, and not upon lakes or navigable rivers, above the ebb and flow of the tide. *Case of Steamboat Thomas Jefferson,* 10 Wheat. R. 428 ; S. C. 6 Cond. R. 173 ; *Steamboat Orleans* v. *Phœbus,* 11 Pet. R. 175 ; Gilp. R. 529, 205.

If these positions are correct, the goods in this case were not liable to contribution upon the principle of general average.

3. But, if the maritime law is to be applied upon the Lakes, then the defendant's claim or lien for average, can only be enforced in the courts of the United States, which have exclusive jurisdiction over all maritime causes. The proper mode of ascertaining and enforcing it, would be by libel in the District Court of the United States. 2 Gall. R. 455 ; Dunl. Adm. Pr. 57.

4. The defendants were not entitled to a lien for the freight *pro rata ;* the goods never having been accepted by the plaintiffs *voluntarily.* Ab. Sh. 303, 329, *note; Marine Ins. Co.* v. *United Ins. Co.* 9 John. R. 186 ; *Welch* v. *Hicks,* 6 Cow. R. 504 ; *Center* v. *American Ins. Co.* 7 Cow. R. 564 ; *Hurton* v. *Union Ins. Co.* 1 Wash. C. C. R. 530 ; 5 Binn. R. 525 ; 2 Serg. & Rawle, 229 ; *Catlett* v. *Colum. Ins. Co.* 12 Wheat. R. 383.

*T. Romeyn,* for the defendants.

1. This is a proper case under the *maritime law* for general average. Ab. Sh. 342, '3, '4 ; 3 Kent's Com. 233, '4 ; 8 Mass. R. 467 ; 1 Caine's R. 196 ; 4 Dall. R. 459 ; 2 Serg. & Rawle, 229 ; 6 Mass. R. 125.

2. The maritime law is in force on the Lakes; or, in other

words, they are subject to admiralty jurisdiction. Every District Court of the United States possesses all the powers of a court of admiralty. *Glass* v. *The Betsey*, 3 Dall. R. 6 ; 1 Cond. R. 10. All *maritime* contracts are within the jurisdiction of the admiralty courts. *De Lovio* v. *Boit*, 2 Gall. R. 471, '2, '4 ; *Plummer* v. *Webb*, 4 Mason's R. 380, and cases cited in 1 Kent's Com. 370. As to what are *maritime* contracts, see *De Lovio* v. *Boit*, 2 Gall. R. 475 ; Dunl. Adm. Pr. 43 ; *Strong* v. *N. Y. Firemen's Ins. Co.* 11 John. R. 328 ; *Ramsay* v. *Allegro*, 12 Wheat. R. 615 ; 3 Kent's Com. 244. See also cases cited in Gord. Dig. 145, notes.

Was the contract of shipment in this case, a *maritime* contract? When the voyage is wholly on rivers, and above tide waters, it is admitted that the service is not maritime. 11 Pet. R. 183 ; 7 Pet. R. 344 ; 10 Wheat. R. 428; 6 Cond. R. 174. But the Lakes are different. The dangers of navigation are similar to those attendant on the navigation of the ocean. They form the boundary between foreign governments and ours.

By the English common law, admiralty jurisdiction was restricted to the open sea, and to rivers as far as the ebb and flow of the tide, on the principle that these marked the bounds and limits of counties, and of individual ownership in the soil covered by the water. 1 Kent's Com. 367 ; 1 Hale's P. C. 424 ; 3 Inst. 133 ; *Constable's Case*, 5 Coke, 106 ; *United States* v. *Grush*, 5 Mason's R. 290 ; *De Lovio* v. *Boit*, 2 Gall. R. 427. Above the ebb and flow of the tide, the county or state jurisdiction attached, to the exclusion of the admiralty, and the civil rights of riparian proprietors were different. The high seas, without the county, were subject to the *exclusive* jurisdiction of the admiralty. On bays, havens, creeks, &c. within the county, the common law and admiralty had a *concurrent* jurisdiction. 1 Kent's Com. 367. The English rivers are not

navigable above tide waters; and in *Shrunk* v. *Schuylkill Navigation Co.* 14 Serg. & Rawle, 79, the applicability of the common law of England, even as to rivers, was denied.   Granting, however, that our rivers are subject only to the common law, the Lakes are entirely different.   Riparian proprietors own to the middle of the stream, under a grant bounded by the water's edge.   6 Cow. R. 547; 3 Kent's Com. 429, n. *(a);*   24 Wend. R. 453.   Not so with the proprietors of land bounded by the shore of Lake Erie, or of any of the great Lakes.   The soil under the waters of the Lakes belongs to the public; and, as the limits of admiralty jurisdiction in England, are the same as those of individual ownership of land covered by water, we infer the impropriety of applying the rules of the English common law, to lakes like these.

Whether admiralty jurisdiction extends over the Lakes, is still unsettled.   How ought this question to be settled upon principle?   As to the measure of admiralty jurisdiction, see 2 Gall. R. 469, 470, 471, *n.* 47.   The application of this jurisdiction must depend upon, and be modified by circumstances.   2 Gall. R. 469, 470.   Pet. Adm. Dec. 233.   This is the general doctrine as to all the common law. We have adopted it only so far as it is suitable to our situation.   1 Kent's Com. 472, '3.   What is expedient and suitable here?   Foreign commerce may be transacted on these Lakes.   They separate us from foreign powers.   In times of war, prize questions may arise.   In times of peace, crimes may be committed, which would otherwise go unpunished from the difficulty of conviction at common law. Questions of salvage must arise.   Contracts of affreightment, in their objects and incidents, are here similar to such contracts upon the ocean.   And it is therefore contended, that admiralty jurisdiction extends to the Lakes, concurrently with that of the common law.

3. If the maritime law applies to this case, a court of

common law will apply its principles, and take jurisdiction of the matter.   2 Gall. R. 398.   Dunl. Adm. Pr. 19.

But the defendants do not seek to *enforce* the average in this case.   They act on the defensive, and merely assert a right to retain the goods until the average is adjusted,— they care not by what tribunal.

4. The doctrine of general average is one which exists and may be enforced at common law, in cases to which the admiralty jurisdiction does not extend.   It is an incident to the contract of bailment for the carriage of goods. There is no difference between carriers by land and by water, or between those by inland waters, and on the ocean.   Story on Bailm. 322, 323, and *n.* 1; 2 Kent's Com. 599, 600.   They are all common carriers.   In a case of necessary jettison, a carrier by water is not responsible. Jones on Bail. 108.   2 Kent's Com. 604.   *McArthur* v. *Sears,* 21 Wend. R. 195; 12 Coke, 63.   If then A's goods are sacrificed for the benefit of B. and C., these latter are bound at common law to contribute.   1 Story on Eq. 468; *Deering* v. *Winchelsea,* 2 B. & P. 270; 2 Com. Dig. 536, 569; Hugh. Ins. 285; *Mouse's Case,* 12 Coke 63; *Birkley* v. *Presgrave,* 1 East. 220; *Simonds* v. *White,* 2 Barn. & Cress. 805; *Campbell* v. *Mesier,* 4 John. Ch. R. 336; Story on Bail. 271, '2; 2 Kent's Com. 564, '5; *Gazzam* v. *Cincinnati Ins. Co.* 6 Ohio Rep. 33; 4 Binn. R. 130.

5. The goods in this case were chargeable with ratable freight.   *Luke* v. *Lyde,* 2 Burr. R. 885; Park. Ins. 70; *Hooe* v. *Mason,* 1 Wash. R. 207; *Dorr* v. *New Eng. Marine Ins. Co.* 4 Mass. R. 221, 231; *Coffin* v. *Stoner,* 5 Mass. R. 252; *Portland Bank* v. *Stubbs,* 6 Mass. R. 422; *Welsh* v. *Hicks,* 6 Cow. R. 510; 3 Kent's Com. 228, 229.

WHIPPLE, J. delivered the opinion of the Court.

The facts found by the special verdict present the following questions of law for our consideration :

1. Do they constitute a case under the *maritime law* for general average ?    And if they do, then,

2. Is the maritime law in force upon the Lakes over which the goods were to be transported ?

3. If the maritime law applies to this case, will a court of common law apply its principles, and take jurisdiction of the matter ?

If the maritime law is not in force upon the Lakes, and is inapplicable to the case, then,

4. Is the doctrine of general average, one which exists and may be enforced at common law ?

5. Were the defendants entitled to a lien upon the goods for freight *pro rata*, according to the proportion of the voyage performed ?

These questions will be considered in the order in which they are stated.

1. " General, or gross average, is the contribution to be levied from each person having property at hazard in a sea voyage, whether the ship itself, the freight, or cargo, for indemnifying the person whose property has been advisedly sacrificed for the general safety, against any greater share of the loss than others sustain." 2 Bell's Com. 142. Such is the clear and concise definition given by Bell, in his Commentaries on the laws of Scotland, and it agrees substantially with that given by other authors, ancient and modern.    Chancellor *Kent* says, that " it is one of those rules of the marine law which is built upon the plainest principles of justice, and has accordingly recommended itself to the notice and adoption of all the commercial nations of the world." 3 Kent's Com. 233.    It is derived substantially from the famous Rhodian law *de Jactu*, and it seems to have excited especial wonder and admiration, that a rule so perfect in policy and justice, should be found in the most ancient code of maritime law.

" Two things are necessary to found the right to contri-

bution: 1. That the property shall have been advisedly sacrificed for the common safety. 2. That such sacrifice shall have preserved the property of those concerned." 2 Bell's Com. 143. The facts in this case justified the jettison, and it appears to have been made advisedly: it was the means, also, of preserving the property of others. The case, then, is a proper one for general average under the *maritime law.*

2. Is the maritime law in force upon the Lakes over which the goods were to be transported? This question could not be advisedly settled without a more extended examination, than the time at my command will enable me to make, into the nature and history of the maritime code, which had its origin in remote antiquity, which resisted the assaults of powerful opponents, which embodies so much wisdom and justice, and which has exerted so benign an influence upon man as a civilized being. The ancient jurisdiction of the admiralty is involved in much doubt and obscurity, but it is clear that it took " cognizance of questions of prize ; of torts and offences, as well in ports within the ebb and flow of the tide, as upon the high seas ; of maritime contracts and navigation;" "of all controversies respecting freight; of damages to goods shipped; of the wages of mariners ; of the partition of ships by public sale ; of jettison," &c., &c. *DeLovio* v. *Boit*, 2 Gall. R. 400. Mr. Justice *Story*, in pronouncing the opinion in that case, in support of the jurisdiction of the admiralty, entered into a very minute and critical examination of those ancient records which have come down to us from a remote antiquity, and traced, with great learning and fidelity, the various laws and ordiances which were adopted in England, from time to time, enlarging, restraining, or modifying the jurisdiction of the admiralty ; quoting freely from the Black Book of the admiralty, the laws of Oleron compiled by Richard I., the several ordinances in the reigns

of John and Edward I., and records in the reign of Edward III., who gave to the laws of Oleron their final confirmation.

An ordinance in the reign of Edward I. declared, "that every contract between merchant and merchant, or merchant and mariner, *beyond sea, or within the flood mark*, should be tried before the admiral, and not elsewhere;" and, at a convocation of all the Judges of the realm, in the reign of Edward III., the jurisdiction of the admiralty was vindicated and preserved. The Black Book, which contained the laws of Oleron, is deemed by Judge *Story* to be of the highest authority ; and in it we find the jurisdiction of the admiralty extending to torts, &c. arising upon the *high seas, and to ports within the ebb and flow of the tide.* A reference, also, to the commissions of the Judges, in this and the preceding reigns shows, that their jurisdiction extended to maritime transactions upon the *high seas alone.* Judge *Story* further remarks, " that this jurisdiction was, from its original establishment, *exclusive* of the courts of common law in all cases, may, perhaps, admit of some doubt;" " but that there is any authority previous to 13 Rich. II. which, properly considered, impeaches the jurisdiction of the admiralty, as here asserted, may be with some confidence denied." The history of the war made by Lord *Coke* upon the jurisdiction of the Courts of Chancery and Admiralty, is well known to the legal student, and how much credit is to be awarded to him in his effort to impugn the jurisdiction of those Courts, may be gathered from a remark which fell from the lips of that eminent lawyer, Mr. Justice *Buller*, who said, that, " with respect to what is said relative to the admiralty jurisdiction in 4 Inst. 135, that part of Lord *Coke's* work has been always received with great caution, and frequently contradicted. He seems to have entertained not only a jealousy of, but an enmity against that jurisdiction." In the memorable con-

test in the time of Lord *Coke*, respecting the jurisdiction of the admiralty, the views of that learned Judge may be gleaned by reference to his 4th Institute.    They are attempted to be sustained by a series of cases which are there cited, all of which are met, and the inferences he seeks to establish successfully refuted, by Justice *Story*, in the case of *De Lovio* v. *Boit.*

But it was principally on the statutes of 13 Rich. II., 15 Rich. II., and 2 Hen. IV. that the controversy respecting the admiralty was kept up for more than two centuries.    On the part of the admiralty, it was maintained, that those statutes never intended to abridge their jurisdiction; but that it extended, 1. Over torts and injuries upon the high seas, and in ports within the ebb and flow of the tide.  2. Over all maritime contracts arising at home or abroad.  3. Over matters of prize and its incidents.    On the other hand, the courts of common law held, that the jurisdiction of the admiralty was confined to contracts and things, exclusively, made and done upon the high seas, and to be executed upon the high seas ; and that it had no jurisdiction over torts, offences, or injuries, done in ports within the bodies of counties, notwithstanding the places be within the ebb and flow of the tide ; nor of contracts made upon the high seas to be executed upon land.    With this controversy in its progress and termination, I have nothing to do, as the simple object in noticing it, was to show, that the maritime code is applicable to the *high seas, and to ports within the ebb and flow of the tide.*    It seems admitted, however, " that the courts of common law, in England, by a silent and steady march, have extended the limits of their own authority, until they have usurped or acquired concurrent jurisdiction over all cases, except of prize, within the cognizance of the admiralty."    2 Gall. R. 422. At first, they disclaimed all cognizance of things done *without* the bodies of the counties of the realm ; and even over

Rossiter *v.* Chester.

collateral matters done out of the realm, which came inci-
dentally in question, upon issues regularly before the courts.
" Finally, after much hesitation and doubt, by the use of a
fiction, often absurd, and never traversable, they held cog-
nizance over all personal causes arising on the high seas, or
in foreign realms, without any regard to the place of their
transaction or consummation."   " Upon what principles of
the ancient common law, this extension of jurisdiction,"
(says Justice *Story,)* " can be supported, it is difficult to
perceive." It would not be uninteresting here, to consider
the reasons upon which the courts of common law insisted
that the admiralty was excluded from jurisdiction in ports
and havens, but no valuable result can be attained by
prosecuting this inquiry, as the reasons given, are based
upon the construction of several English statutes, and not
upon the ancient common law.* I shall conclude this
brief review of the question of jurisdiction, by quoting
from Sir *H. Spelman.* He says :  " The place absolutely
subject to the jurisdiction of the admiralty, is the sea,
*which seemeth to comprehend public rivers, fresh waters, creeks,
and surrounded places whatsoever, within the ebbing and flow-
ing of the sea at the highest water.*"

Let us now recur to the Constitution of the United
States, the acts of Congress, and the decisions of our own
courts, to see how far the principle laid down by *Spel-
man*, and sustained by Lord *Hale*, is supported.   To the
courts of the United States, the Constitution has delegated
the power to take cognizance " of all cases of admiralty
and maritime jurisdiction ;" and an act of Congress has
given to the District Courts of the United States, " cog-
nizance of all civil causes of admiralty and maritime ju-

---

* One of those statutes, viz : the statute of 15 Rich. II. ch. 3, expressly prohibits
the admiralty from taking cognizance of "all manner of contracts, pleas and quereles,
and all other things, done or arising within the bodies of counties, as well by land as
by water." In respect to the true construction of which, there was a great conflict of
decision.

risdiction, including all seizures under laws of impost, navigation or trade, of the United States, where the seizures are made on waters *navigable from the sea*, by vessels of ten or more tons burden, within their respective districts, as well as upon the *high seas*."

The first case I refer to, is that of *Steamboat Orleans* v. *Phœbus*, 11 Pet. 175, heard on appeal from the District Court of the District of Louisiana. Phœbus, who was the owner of one sixth part of the steamboat Orleans, filed a libel on the admiralty side of that Court, against Forsyth and others, who were the owners of the other five sixths parts of the boat, alledging himself to be a part owner and master of the boat, and that he had been dispossessed by the owners, who were navigating, trading with, and using the boat contrary to his wishes; that he wished to have an amicable sale of the boat, but the other owners refused, and were about to send her up the Mississippi on another trip ; that the boat then lay at New Orleans, within the ebb and flow of the tide, and within the admiralty jurisdiction of the Court. He therefore prayed admiralty process against the boat, and that she might be sold, and one sixth part of the proceeds be paid to him, &c. The claimants and owners of the five sixths of the boat, admitted the title of the libellant, but denied the jurisdiction of the Court, alledging, that the boat did not navigate waters where the tide ebbs and flows ; and further, that she was not a maritime boat, and was never intended to navigate the seas. It was stated in argument by counsel, that the principal reason for bringing the case before the Supreme Court, was to obtain the judgment of that tribunal upon the question of jurisdiction which was raised. Mr. Justice *Story*, in delivering the opinion of the Court, says : " There is no doubt that the boat was employed exclusively in trade and navigation upon the waters of the Mississippi, and its

Rossiter v. Chester.

tributary streams; and that she was not employed or intended to be employed in navigation or trade on the sea, or on tide waters." "Though in her voyages she may have touched at one terminus of them, in tide waters, her employment has been, substantially, on other waters." " The true test of jurisdiction in all cases of this sort, is, whether the vessel be engaged, substantially, in maritime navigation; or in interior navigation and trade, *not on tide waters*. In the latter case there is no jurisdiction." This decision seems to me to be conclusive against the defendants upon the first proposition.   The case is a strong illustration of the principle, that the maritime law applies exclusively to things done upon or relating to the sea; for it is to be noted that the boat touched, at one terminus of her voyage, *in tide waters*.   It is admitted by the counsel for the defendants, that when the voyage is wholly on *rivers*, and above tide waters, the service is not maritime; but it was insisted with much force and great reason, that the rule which prevails in respect to such rivers, is inapplicable to *the Lakes*.   We have not been insensible to the reasoning upon which the distinction is founded, nor have we failed to give to it the most deliberate consideration.   It is admitted that the dangers attendant on the navigation of the sea, are also attendant on the navigation of the Lakes; that these Lakes constitute the national boundary line between this country and the most powerful maritime power in the world; and that the same reasons exist, for applying to vessels engaged in navigating the Lakes, the wise and equitable provisions which are to be found embodied in the maritime code, which exist for their application to vessels navigating the ocean.   We have, also, well considered the English rule, and the reasoning and principles upon which it is based, that the admiralty jurisdiction was *restricted* to the open sea, and *to the rivers as far as the ebb and flow of the tide*; and we are free to say,

that if the question could be regarded as an original one,— if we did not feel trammelled by the uniform current of decisions in the courts of the United States, we should be strongly inclined to apply the maritime law to the Lakes. But, as it is, we must bow to the rule which is universally recognized by elementary authors, and the decisions of judicial tribunals, that the maritime law applies to *tide waters* alone.   We feel bound to yield to that policy which teaches us, that in respect to the commerce and navigation of the United States, and indeed upon all questions involving principles of national and constitutional law, uniformity of rules and decisions, is of the highest importance, and that consequences of the most serious nature would result from a conflict of decision between the federal and state courts.   The former having rejected the decisions of the courts of common law, founded upon the various English statutes which have been noticed, regarding those decisions as often contradictory, and rarely supported by any consistent principle, we must also reject them.   2 Gall. 472.   They have so construed the constitution, as to embrace all those cases, which *originally and inherently* belonged to the admiralty, before any statutable restriction.  2 Gall. 473.  Mr. Justice *Winchester* says: " The doctrine that would extend the statutes of Richard to the present judicial power of the United States, seems little short of an absurdity."   And Mr. Justice *Story* remarks, that " there are decisions of the courts of the United States, which completely establish the proposition that the statutes of Richard, and the common law construction of them, do not attach to that clause of the constitution conferring admiralty and maritime jurisdiction upon the courts of the United States; and that, notwithstanding the courts of common law held, that the admiralty had no jurisdiction of things done within the ebb and flow of the tide, *in ports, creeks and havens,* yet, it has been re-

peatedly and solemnly held by the Supreme Court, that all seizures under laws of impost, navigation and trade, in waters navigable from the sea by vessels of ten or more tons burden, *as well within the ports and districts* of the United States, *as upon the high seas,* are causes of admiralty and maritime jurisdiction." This limitation as to the place of seizure, it is true, is prescribed by act of Congress; but it is quite clear that Congress had no authority to include cases within the admiralty jurisdiction, which the terms of the constitution did not warrant. The courts of the United States having rejected the doctrines laid down by the courts of common law in England, we cannot, therefore, refer to them as rules of decision in this Court. We are not permitted to adopt such interpolations upon the maritime code, as the courts of common law have sought to make, in order to save to " lords, cities and boroughs, their liberties and franchises;" to do which, controlled, to a considerable extent, the decisions of those courts abridging the rights of the admiralty.

3. The conclusion to which we have come upon the second question presented by this case, in effect, determines the third; which is, whether, *if the maritime law* applies to this case, a court of common law will apply its principles and take jurisdiction of the matter? Having determined that the maritime law is inapplicable to this case, we cannot, consequently, apply its principles.

4. But it is contended in the fourth place, that the doctrine of general average is one which exists, and may be enforced at common law, in cases to which the admiralty jurisdiction does not extend; that it is an incident to the contract of bailment. To support this position, numerous authorities have been cited by the counsel for the defendants. As they are all of the same general character, and sustain the same general rule, an examination of one or two will be sufficient, to show how far they go to recog-

nize the principle, so ably and strenuously insisted upon in argument.

*Mouse's Case*, reported in 12 Coke, 63, will be first examined. The facts were as follows: " The ferryman of Gravesend took forty-seven passengers into his barge, to pass to London, and Mouse was one of them, and the barge being upon the water, a great tempest happened, and a strong wind, so that the barge and all the passengers were in danger to be drowned, if a hogshead of wine, and other ponderous things, were not cast out, for the safeguard of the lives of the men." Mouse brought an action of trespass, and upon proof of the above facts, a nonsuit was directed. It is very clear that this case does not support the principle to the extent contended for. All that can be claimed for it is, that the courts of common law will notice the maritime law and apply its principles, when those principles arise, incidentally, in the course of a trial in the common law courts. But it is apprehended, that if, in that case, the court had been called upon, not only to recognize the fact that there was a necessary jettison, which justified the defendant, but also to make contribution according to the rules prescribed by the law maritime, a different result would have followed.

The case of *Simonds* v. *White*, 2 Barn. & Cress. 805, in no wise supports the rule. It was an action of assumpsit, brought to recover back money paid by the plaintiff to the defendant, at St. Petersburgh, as a contribution to a general or gross average, settled according to the Russian law. The only question in the case was, whether the plaintiff could recover back the difference between the amount thus paid, and the amount he would have been obliged to pay, on an adjustment of average made according to the law of England. The court having determined that the place of destination was the place at which the average should be adjusted, gave judgment for the defendant on the case

Rossiter *v*. Chester.

made. Chief Justice *Abbott*, in delivering the opinion of the Court, remarks, that the obligation to contribute depends upon a general principle of *maritime law :* and further, that " the shipper of goods, tacitly, if not expressly, assents to general average, as a known *maritime usage.*"

The case of *Gazzam* v. *Cincinnati Insurance Co.* 6 Ohio R. 33, was an action of assumpsit on a policy of insurance. A special verdict was found, which specified the particular items of loss, and among these items appears the following: " The boat's average on jettison of cargo, $724.34." The question presented for the consideration of the Court was, whether the several items mentioned in the verdict, were, in point of law, chargeable under the policy. With respect to the particular item for average, the difference between the counsel arose upon the true construction of the policy of insurance, and not upon the authority of the Court, to take cognizance of cases in which the doctrine of average was raised, and when that power was invoked to direct a contribution according to the rules prescribed by the maritime law. Such a decision, thus made, in which the question of jurisdiction was not even suggested, much less discussed, can have but little weight. Without analyzing the other cases referred to by counsel in argument, (all of which have been carefully examined,) we feel bound, though reluctantly, to declare, that the doctrine of average is known only to the maritime law, and cannot, therefore, be enforced in a court of common law. This conclusion was, indeed, a necessary consequence of the views taken by us in the discussion of the principal question involved in this case ; and we are strongly confirmed in the correctness of that conclusion, by the consideration that, with exception of the case of *Gazzam* v. *Cincinnati Insurance Co.*, no authority can be found asserting a contrary doctrine, where the jettison was not on tide waters. Another insuperable ob-

jection to the jurisdiction of courts of common law, in questions of average, arises from the fact, that it would be exceedingly difficult for such tribunals to adjust the interest which is involved in the common calamity. The parties interested in the proceeding, may be five or five hundred. The owners of the ship, and the freight, and the cargo, have each a separate, and often adverse interest to each other, and it may be readily imagined what embarrassment would necessarily follow an adjustment of such adverse interests in a court of law. Mr. Justice *Story*, (Story on Eq. §491,) presents, in a strong light, the objections to such an assumption of jurisdiction. He says that, "in a proceeding at the common law, every party having a sole and distinct interest must be separately sued; and as the verdict and judgment in one case would not only not be conclusive, but not even be admissible evidence in another suit, as *res inter alios acta;* and as the amount to be recovered must in each case depend upon the value of all the interests to be affected, which of course might be differently estimated by different juries; it is manifest, that the grossest injustice, or the most oppressive litigation might take place in all cases of average on board of general ships." These difficulties are all obviated by a recourse to those courts whose proceedings are regulated by the course of the civil law. The simplicity and equity of the rules which prevail in such tribunals, render them eminently safe, convenient, and expeditious, in cases of this nature.

5. I shall now briefly consider the last question raised by the special verdict, and that is, whether the defendants were entitled to a lien for freight *pro rata?*

There are two cases in which the right to ratable freight arises: 1. When the ship has performed the voyage, and has brought only a part of her cargo to the place of destination; 2. When she has not performed her whole voy-

Rossiter *v.* Chester.

age, and the goods have been delivered to the merchant, at a place short of the port of delivery.   In the case of a general ship, freight is due for what is delivered, the contract being, in its nature, divisible ; but if a ship be chartered at a specific sum for the voyage, and she loses part of her cargo by a peril of the sea, and conveys the residue, it has been a question, whether the freight could be apportioned.  3 Kent's Com. 227.   The weight of authority, says Chancellor *Kent,* is against apportionment of freight in such a case, upon the principle that the contract of affreightment is an entire contract, and it follows that a delivery of the whole cargo is a condition precedent to the recovery of freight.   The rule applicable to the present case is thus stated by Lord *Tenterden,* in his admirable work on Shipping.   The apportionment of freight usually happens when the ship, by reason of any disaster, goes into a port short of the place of destination, and is unable to prosecute and complete the voyage.   In this case, we have already seen that the master may, if he will and can do so, hire another ship to convey the goods, and so entitle himself to the whole freight; but if he is unable, or if he declines to do this, the general rule of the ancient maritime law is, that freight shall be paid according to the proportion of the voyage performed.   The rule as laid down in the law of Oleron, is to the following effect : " If a ship depart with a cargo from Bordeaux, or other place, and it happens that the ship is disabled, and as much of the cargo is saved as possible, the merchants and master enter into a great debate, and the merchants demand to have the goods of the master; they may have them, upon paying freight for so much of the voyage as the ship has advanced, ratably in proportion if the master pleases ; but if the master will, he may repair his ship, if he can do it speedily, and, if not, he may hire another ship to complete the voyage, and shall have his freight of the

goods, to be reckoned according to their proportion to the whole cargo." Such is the simple and precise language used in this ancient code in respect to the principle we are considering. The same equitable rule is adopted by other authors on maritime law, and in the French ordinance on this subject.

The opinion of Lord *Mansfield*, in the case of *Luke et al.* v. *Lyde*, 2 Burr. R. 883, seems to have had a controlling influence upon subsequent cases involving the same questions; and in the note in Ab. on Sh. 329, by Mr. Justice *Story*, it is said, that "that case seems at first to have been understood to justify the claim of a *pro rata* freight, whether there was a voluntary or compulsive acceptance of the goods at an intermediate port by the owner." It will be found upon critical examination of that case, that the following rule was established : that if a freighted ship becomes accidentally disabled on her voyage without the fault of the master, the master has his option either to refit, or to hire another ship to carry the goods to the port of delivery. If the merchant disagrees to this, and will not let him do so, the master will be entitled to the whole freight of the full voyage. If the ship is so disabled that the master cannot carry the goods in her, or he cannot find a ship to carry them to the port of delivery, he shall still be paid his freight, in proportion, however, only to what he has performed of the voyage ; but the merchant may abandon all the goods, and then he is excused freight.

In the case of *Scott* v. *Libby and others*, 2 John. R. 336, Mr. Justice *Thompson*, remarked as follows:  " Nor is this a case for *pro rata* freight. Here was no acceptance of the cargo at an intermediate port. A variety of cases may occur where the owner of goods may make himself responsible for freight by an *acceptance* of his goods short of the port of destination. But this results from an *im-*

*plied contract, raised by the acceptance of the cargo;* and a supposed benefit received by the owner, from a partial transportation of the goods." It is to be noticed here, that much stress is laid upon the fact that there *was no acceptance of the cargo* at an intermediate port, and therefore no contract to pay freight could be implied.

In the case of *Williams* v. *Smyth,* 2 Caine's R. 13, the same Judge says, " We take it to be a well settled rule, that where a ship by reason of any disaster, goes into a port short of the place of destination, and is unable to prosecute and complete the voyage, and the goods are there received by the owner, freight must be paid according to the proportion of the voyage performed."

The rule thus laid down was fully recognized in the case of *Robinson* v. *Marine Ins. Co.,* 2 John. R. 323, where *Kent,* Chief Justice, uses this strong language: " It is now too late to deny or disregard the rule, that freight *pro rata itineris* is due when a ship, by reason of perils, goes into a port short of her destination, and is unable to prosecute the voyage, and *the goods are there received by the owner.* An implied assumpsit to pay for the labor and service rendered, is raised by the acceptance of the goods at the intermediate port." And the Chief Justice refers to *Luke* v. *Lyde* in support of the rule thus laid down.

In the case of *Marine Ins. Co.,* v. *United Ins. Co.,* 9 John. R. 186, the Court held, that " there must be a voluntary and unconditional acceptance of the goods, by the owner, at an intermediate port, to form the basis of a new contract to pay ratable freight." The same doctrine is recognized in *Welch* v. *Hicks,* 6 Cow. R. 504, in *Center* v. *American Ins. Co.,* 7 Cow. R, 564, and in *Hooe* v. *Mason,* 1 Wash. R. 207.

The cases of *Callender* v. *Insurance Co. of North America,* 5 Binn. R. 525, and *Gray* v. *Waln,* 2 Serg. and Rawle, 229, sustain the rule, that to justify the claim of a *pro*

*rata* freight, there must be a voluntary acceptance of the goods at the intermediate port, *either by words or actions*, so as to leave a fair implication that the further carriage of the goods was intentionally dispensed with. And the principle of these cases has been adopted by the federal courts. *Catlett* v. *Colum. Ins. Co.*, 12 Wheat. R. 383; *Caze* v. *Baltimore Ins. Co.*, 7 Cranch, 358.

It only remains to apply these principles which are founded in equity and justice to the facts of this case.

1. Was the boat, by reason of perils, driven into a port short of her destination? It clearly appears that she was. The special verdict finds that Chicago was her port of destination; that she encountered a severe gale and was in danger of perishing from the violence of the wind and the roughness of the waves; that after long struggling with the tempest and being in great danger of perishing, the master and crew agreed that it was necessary to lighten her, &c., and further, that the boat was got back in safety to the port of Detroit.

2. Was she unable to prosecute the voyage? That she was, appears from the finding in the special verdict, that " the close of navigation was at hand, and the vessel being much injured, the voyage was abandoned."

3. Were the goods accepted by the plaintiffs at Detroit, the intermediate port? A little more difficulty arises in giving an answer to this question, for the reason, that in considering whether there was, or was not, a voluntary acceptance by the owner of goods at an intermediate port, the courts do not seem to understand in the same sense, the same principles. In the language of the learned note, from which I have freely quoted, it is said that " a *voluntary* acceptance may, in some of the cases, have been thought to mean no more than an acceptance of the goods or their proceeds, whether it has resulted from choice *in waiving any farther transportation of the goods*, or from that

Rossiter *v.* Chester.

moral necessity, which the impossibility of pursuing the voyage, or otherwise preserving the goods, might impose upon the owner." Abb. Sh. 329, note. But whatever obscurity may appear in the reasoning of some judges on this point, we think it very clear that but little doubt can exist in the present case. The plaintiffs were fully advised that the voyage, in consequence of the dilapidated condition of the boat, and especially in view of the fact that the season had so far advanced as to render its prosecution extremely hazardous, was abandoned. This circumstance, taken in connection with the further fact that the plaintiff offered to accept the goods upon payment of the charges for storage, and that the present action was brought to recover the possession of the goods, shows very clearly that there was, both by words and actions, such a voluntary acceptance, as to create a fair implication that the further carriage of the goods was intentionally dispensed with. And, as there was no default on the part of the master, or refusal, upon demand made by the owner of the goods, to prosecute the voyage at the earliest moment consistent with prudence, we are of opinion that there existed a lien for the payment of freight *pro rata*.

FELCH, J. did not participate in the decision, the cause having been argued before he took his seat upon the bench.