L. F. HENDERSON, Adm'r *de bonis non*, of WILLIAM CARGILL, deceased, *v.* MICAJAH CARGILL et al.

1. HUSBAND AND WIFE: PROOF OF MARRIAGE: EVIDENCE: REPUTATION.—In all cases except in actions for *crim. con.*, and in prosecutions for bigamy, the fact of marriage may be established by evidence of the acts and declarations of the parties, by proof of the general repute in the family; and by proof of the declarations of deceased persons, who were related to them by blood or marriage, made *ante litem motam.*

2. SAME: EVIDENCE: PART OF RECORD: WHEN ADMISSIBLE.—Where the whole of a record which could have any bearing upon the case before the court is offered in evidence, it should be admitted; and hence, in a suit involving the question of marriage between two parties, and the consequent legitimacy of their offspring the children may introduce, in support of the marriage, a bill filed by one of the parents against the other for a divorce, and the answer thereto, in which it

is charged and admitted that a marriage was legally solemnized between them, without a production of any other part of the record.

3. EVIDENCE: DECLARATIONS, POST LITEM MOTAM.—It is incumbent on the party who objects to introduction in evidence of the declarations of deceased members of a family in relation to pedigree, upon the ground that they were made *post litem motam*, to show that they were, in fact, made after a controversy had, in fact, arisen on the subject.

4. EVIDENCE: PEDIGREE: GENERAL REPUTATION NOT ADMISSIBLE.—The principle upon which the law resorts to hearsay evidence, in cases of pedigree, is the interest of the declarants in the person from whom the descent is made, and their consequent interest in knowing the connections of the family; and hence, the rule of admission is restricted to the declarations of deceased persons who are related by blood or marriage to the person, and, therefore, interested in the succession in question; it is not, therefore, competent to introduce as evidence to establish or disprove a marriage, the general reputation in the neighborhood on that subject, outside of the members of the family. See Greenl. on Evid. § 103; 3 Term. R. 307; 4 Rand. 711.

5. EVIDENCE: PRESUMPTIONS IN RELATION TO MARRIAGE.—Proof that a man and woman cohabited together as husband and wife, and that they acknowledged and treated each other as such, and that they were so regarded and treated by their relations, and that they had children which they owned, and to which they gave the family name, raises the legal presumption that they were legally married; and such presumption will not be overturned by proof that the parties made declarations denying the existence of the marriage, unless they were made under circumstances of peculiar seriousness and solemnity; nor by conduct, on their part, which only amounts to suspicion that no marriage had, in fact, taken place. See *Hervey* v. *Hervey*, 2 W. Black. R. 877; Matthews on Presump. Ev. 284; Buller's Nisi Prius, 112.

6. NEW TRIAL.—After two verdicts for the same party, the case should be a very clear one, before a new trial should be awarded on the ground that the verdict is against the weight of the evidence.

7. EVIDENCE: DEPOSITIONS: HOW CERTIFIED.—Depositions taken in a sister or foreign State, to be read in evidence in the courts of this State, must be certified according to the law of the State where they are taken.

8. EVIDENCE: DEPOSITION: PRESUMPTION IN FAVOR OF.—If it appear from the caption or certificate to a deposition that the witness swore to the answers as written out, it will be presumed that the oath was administered according to law, and that the answers were read over to and approved by the witness.

9. SAME: DEPOSITION: FORM OF.—If, in any part of a deposition it appear in what cause it was taken, and from what court the commission issued, it will be sufficient; these facts need not be stated either in the caption or certificate.

10. MISTAKE: CLERICAL ERROR IN DEPOSITION.—A clerical misprision, by which the caption of a deposition is made to state that the commission issued out of the Probate Court, instead of the Circuit Court, will not vitiate the deposition, if it also appear, either from the caption or commission, that it was issued out of the proper court.

11. EVIDENCE: DEPOSITION: SEAL OF COMMISSIONER.—If there be no legislative rule to the contrary, in the State where the deposition is taken, it is unnecessary for a commissioner, who takes a deposition in a sister State to be used in this State, to certify the deposition under his seal; although the commission under which he acts directs that he should certify the deposition under his hand and seal. See *Ward* v. *Ely*, 1 Dev. R. 375.

12. MISNOMER: DEPOSITION.—A misnomer of a witness in a commission to take a deposition is fatal. If the commission direct the deposition of Nancy *Griffin* to be taken, it will not authorize the examination of Nancy *Griffith*—the two being separate and distinct names.

APPEAL from the Probate Court of Hinds county. Hon. Henry G. Johnson, judge.

In 1845, Micajah Cargill and others, filed their petition in the Probate Court of Hinds county, against the administrators of William Cargill, praying that distribution of one-half of his estate be made to them, as heirs at law.

The petitioners claimed distribution, as next of kin, of said Willliam Cargill, alleging that he died without leaving any children, and that they were his brother and sister, and the children of two of his deceased sisters, who had *died* previous to his death.

The defendants—among whom was the then widow of said William Cargill—answered, setting out that the condition of the estate at that time would not admit of distribution, it being involved in litigation, and that many debts due by the estate had not been paid, and that the debts due the estate had not all been collected. The defendants also answered, as follows:—" Respondents state that they do not know whether the said parties, complainants, are the legal distributees of their intestate or not, and inasmuch as they are not informed on that subject, they insist upon strict proof being adduced to the court, that the persons claiming distribution are entitled to receive what they demand. Respondents are more inclined to insist upon this course from the fact, that doubts have been suggested to them, whether the said petitioners have any legal claim whatever to distribution in William Cargill's estate."

Upon these pleadings, the Probate Court, upon motion of defendants, directed the following issue to be certified to the Circuit Court of Hinds county, to be tried by a jury, viz:

" Whether or not the parties, petitioners, are the lawful heirs

and relations of William Cargill, deceased, as set forth in their petition on file in this court, and entitled to distribution accordingly."

The issue was afterwards tried before a jury, and a verdict was returned for petitioners. The defendants appealed, and the High Court set aside the verdict, and granted a new trial. See *Ragan* v. *Cargill*, 2 Cushm. R. 540.

At the February Term, A. D. 1853, of said Probate Court, a more formal issue was directed to be made between the parties. An issue was accordingly made, in which it was averred by petitioners, and denied by defendants; that the petitioners were the brother and sister, and the descendants of the deceased sisters of said William Cargill, and were his lawful heirs.

In September, A. D. 1854, this last issue was tried before a jury, in the Hinds county Circuit Court, and a verdict rendered for petitioners, which verdict, together with the record of the proceedings in said court, were ordered to be certified to the Probate Court.

The defendants made a motion in the Circuit Court to set aside the verdict, and for a new trial; but the court declined to entertain the motion upon the ground, that it had no jurisdiction or power to grant it.

Several bills of exception were taken to the ruling of the Circuit Court, during the trial.

1. Defendants objected to the reading of Elizabeth Cargill's deposition, because the certificate of the commissioner was insufficient.

The commissioner certified that "* * * Elizabeth Cargill personally appeared before him, and upon being sworn, deposeth, and sayeth, the answers as 'written out' to the foregoing interrogatories, and cross-interrogatories, are just and true.

Her

Signed,        ELIZABETH &times; CARGILL."

mark.

The court overruled the objection, and defendants excepted.

2. Defendants objected to the reading of the deposition of Milby Rogers, on the ground that there was no seal to the certifi-

cate of the commissioner; and because it did not appear that it was the deposition of the witness, or that it was read over or approved by the witness. The objection was overruled, and the defendants excepted.

The facts in relation to this deposition are fully stated in the opinion of the court.

3. Defendants objected to the admission of the certified copy of the bill, filed in the Chancery Court by Demarias Cargill and Thomas Cargill, and of his answer thereto, upon the ground that it did not appear from the certificate of the clerk that the transcript contained all the record in the cause, and upon the ground, that the suit was between persons not parties to this suit; and because the bill was filed during the last illness of W. Cargill, and the answer was filed after this controversy arose. This objection was overruled, and defendants excepted. The certificate of the clerk was merely, that the transcript contains a true copy of the bill and answers.

4. The objection made by petitioners to the reading of the deposition of Nancy Griffith, is fully stated in the opinion of the court.

5. The court excluded the answers of certain witnesses for defendants from the consideration of the jury. In these answers the witnesses stated what was the report or understanding amongst the neighbors in reference to T. Cargill and Demarias Cargill's connexion; what was said by the neighbors on that subject. The following answers were some of those excluded; and the remainder were in substance the same.

"But to the best of my recollection, report said he was not married." "I think, from report, that the reason of his leaving said ferry was, that public opinion was against him." "Thomas Cargill's character was reported as being very bad." "I remember frequently hearing that they (the Cargill's,) kept a disorderly house." "The general impression in the neighborhood was, that he (Thomas Cargill,) was not married, but was living in adultery with a woman, Demarias." "He was not considered in the community as being a married man." "They were not regarded as

man and wife." "She (Demarias,) was regarded in the neighborhood as a woman whom Thomas Cargill kept as a prostitute."

The following instructions were given for the petitioners:—

1. Proof that a man and woman lived together as man and wife, if not rebutted, is conclusive evidence of their marriage.

2. Where a man and woman live together as man and wife, acknowledging, and treating each other as such, the presumption is that they have been lawfully married; and this presumption becomes the stronger, when they are regarded and treated by their relations as man and wife; and the more so when they have children, and own them as such, and give them the family name.

3. Counter declarations made by such man and woman, except such as are made under circumstances of peculiar seriousness and solemnity, will not suffice to overthrow such presumption of a marriage; much less will circumstances in the conduct of the parties, which only excite suspicion that no marriage was celebrated.

4. Declarations of deceased members of the family are evidence to show relationship and pedigree; reputation in the family is also evidence to prove relationship and pedigree; but the jury must disregard all proof of neighborhood reputation, reports and rumors as to the non-existence of such marriage, relationship, and pedigree.

5. Proof that neighbors refused to visit the parties, on account of reports that they were not married, is no evidence of the truth of such reports.

6. If the jury believe from the evidence, that the plaintiffs or petitioners are the legitimate brother and sister, and nephew and neice of Mrs. Cargill, born in lawful wedlock, they will find the issue for said plaintiffs.

On behalf of defendants, thirteen instructions were given, of which it is only necessary to set out the following:—

1. The burden of proof in this controversy is on the petitioners.

3. Although it is true that a marriage may be legally inferred from cohabitation and reputation, yet if it appear from the evidence, that the acts of the parties were inconsistent with the relationship of husband and wife, and that there was no general repu-

tation recognizing them as such, then the legal inference of a marriage does not arise.

4. One relying upon reputation and cohabitation to establish a marriage, must adduce such facts and circumstances in proof, as leave the mind of the jury free from all rational doubt as to the existence of such marriage.

5. The best proof of a marriage, in those States where a bond and license are required, is an exemplification of the record of such marriage.

12. The living together and holding themselves out to the community as man and wife, is not positive proof of marriage, but facts from which a marriage may be presumed; and if that presumption be rebutted by evidence on the part of defendants of the condition of the parties, their declarations and their conduct, then the plaintiffs must prove an actual marriage, or, as the law terms it, a marriage *de facto,* before they can recover.

The defendants excepted to the charges given on behalf of plaintiff.

The evidence in the cause was very voluminous, but so far as it retates to the question of marriage between Thomas and Demarias Cargill, was substantially as follows:—

For the plaintiffs.

Elizabeth Cargill's deposition, taken in 1846, was read.—Witness has been acquainted with Thomas Cargill since 1796, and with Demarias Cargill, his wife, from 1810 to 1820. They lived together as man and wife, and so acknowledged themselves; and their brothers and sisters regarded them as such. Mrs. Cargill's name, before her marriage, was Demarias Colbert. They had eight children, whom they publicly acknowledged and treated as their own: has lived for sixteen or seventeen years in the same neighborhood with them, and never heard that they were not married; thinks if they were not she would have heard it; has heard their brothers and sisters frequently speak of their marriage. Witness is the widow of one of T. Cargill's brothers; and from what she heard her husband say, they were married in 1791 or 1792; they lived together until 1826 or 1827, when they separated;

but she did not know for what cause. This witness proves the names and ages of the children, and that William Cargill was one of them. She further stated, that between 1790 and 1795 T. Cargill moved to Georgia, and from that State to Montgomery county, Alabama, in 1815, whence he moved to Autauga county, and thence to Marshall county, in that State. Witness first became acquainted with them in Georgia. When T. Cargill left Georgia in 1815, he only removed his negroes; he left his white family well provided for; and in about two years came back and moved them.

Alcey Johnson's deposition, taken in 1853.—Witness is fifty-seven years old, and resided the greater portion of the time, between 1810 and 1820, in Jasper county, Georgia. Knew Thos. Cargill and wife, from 1807 until they moved to Alabama. They lived together as man and wife, and so acknowledged themselves in the community; has heard her acknowledge him as husband, and has heard him call her wife. Witness visited them, and they were visited by respectable people; it was not understood in the neighborhood that T. Cargill left Georgia to prevent a prosecution threatened against him for adultery; but he left to prepare a place to which to move his family—which he did in about twelve months. When he first left he carried his negroes; he left his white family well provided for. Witness is not related to any of the parties.

Ellison Gross's deposition, taken in 1853.—Witness is sixty years old, and resided the most of the time, between 1810 and 1820, in Jasper county, Georgia; was acquainted, in that county, with Thomas Cargill and Demarias Cargill, his wife; they lived together as man and wife, and when he spoke of her, he called her "wife." They had children which they acknowledged and claimed as theirs. Remembers Micajah, Jason, John, and William. Witness visited them, and saw respectable people visit them; has never heard the subject of their marriage discussed among the neighbors; never heard of T. Cargill leaving Georgia to prevent a prosecution. Not related to any of the parties.

John Price's deposition, taken in 1853.—Witness knew Thomas Cargill and Demarias Cargill, from 1808 until they left Georgia for Alabama. They resided in Jasper county, Georgia, on the

Ocmulgee river; they passed as husband and wife, and lived together as such; never heard the marriage discussed among the neighbors; knows nothing of the circumstances attending T. Cargill's removal from Georgia.

Hardy Strickland's deposition, taken in 1853.—Witness knew T. Cargill, in Elbert county, Georgia, from 1792 to 1804, and from that time to 1806, in Jackson county, in that State. We lived very near to each other a part of the time; he was a married man, and his wife was a Colbert before her marriage; they had one child when he first knew them; he never knew T. Cargill to live but with that one. woman; they lived as husband and wife, and were so regarded. When they moved from Jackson county they had six children: Micajah, John, Jason, William, and two daughters.

Jacob D. Shelby's deposition, taken in 1854.—Witness was acquainted with T. Cargill from 1824 or 1825 to 1827 or 1828, in Shelby county, Alabama, where they both resided. Witness lived twenty-five miles distant from T. Cargill, but was frequently at his house. Witness was a public officer—a constable; and for three years sheriff—during the time he knew T. Cargill, and was frequently in his neighborhood on business. He lived with a woman whom he recognized as his wife, as long as witness knew him. Don't know the name of his wife; only knew her as Mrs. Cargill, by which name she was called and known in the neighborhood. They had four children whom he knew. Witness is now clerk of Talladega county, Alabama, and has been for twenty years, except six months, when he served as captain of a company in the Mexican war.

Barsheba Stroud's deposition, taken in 1853.—Is sixty-six years old; resided in Madison county, Georgia, until 1812, when she moved to Jasper county, and there resided until 1820. Was acquainted with T. Cargill and Demarias Cargill from her earliest recollection; she lived, at one time, within a mile of them, and went to school with their children. They lived together as man and wife; but she does not recollect to have heard them acknowledge themselves as such. They had children whom they acknowledged as their own. Her parents and the other neighbors visited

them. Never heard the marriage discussed; never heard of T. Cargill removing from Georgia to avoid a prosecution for adultery.

Truman Walthall's deposition, taken in 1853.—From 1800 to to 1810, witness lived in Jackson county, Georgia; from 1810 to 1820, he resided in Jasper county, near Cargill's residence; knew T. Cargill and Demarias Cargill during his residence in Jasper county; they lived together as man and wife; don't know whether they acknowledged themselves as such or not; they had children whom they acknowledged as their own. Witness visited them, and they were visited by other respectable people; never heard of T. Cargill leaving Georgia to avoid a prosecution. He went away first with his negroes, to prepare a place, before moving his white family; many others, about that time, did the same thing.

Milby Rogers's deposition, taken in 1853.—Witness is seventy-one years old. From 1800 to 1820 she resided in Butts county, Georgia; she became acquainted with T. Cargill and Demarias Cargill while they lived in Jasper county; has not known them since. They lived together as man and wife, and acknowledged themselves as such in the community, and claimed the children as their own. Witness visited them, and so did other respectable people.

Joseph Clark testified, that he saw Micajah Cargill at William Cargill's house, in Hind's county, some five or six years ago; they (Micajah and William) recognized each other as brothers; William introduced Micajah to witness as his brother. Mrs. Cargill, (now Mrs. Ragan,) after her husband's death, did the same thing; has seen Micajah at Mrs. Cargill's since William Cargill's death, and she treated him as a brother; she said Micajah was poor, and she gave him $1000 in cash, and $1000 in a note, as a part of his distributive share in William Cargill's estate.

John D. Wyatt testified, that he knew T. Cargill and family in Georgia, from 1810 to 1819, or 1820; his acquaintance with them was intimate; they lived only a mile from him; he went to school with the two sons, John and William. Mrs. Cargill's name was Demarias; she was known as Mrs. Cargill; T. Cargill and D. Cargill lived together as man and wife, and recognized the children as their own. T. Cargill moved his negroes to Alabama in 1815,

to make a crop; he left Micajah and John with the family and took William with him; he left sufficient means to support the family, who left in 1819 or 1820. Never knew T. Cargill to have any other wife than Demarias.

The testimony of the following witness, given on the former trial, and reduced to writing, was also read for the petitioners.

Mrs. Moore.—Is seventy years old; she lived near T. Cargill and family, in Jasper county, Georgia, and knew them well; she knew the children; the family bore a good character, and were visited by respectable people; never heard it stated that T. Cargill and D. Cargill were not married.

Spencer Bankton.—Knew T. Cargill and family in Jasper county, Georgia, from 1810 to 1817; always saw a woman—Mrs. Cargill —at T. Cargill's house; Cargill's family had a good name, and were visited by respectable people.

Robert Coker.—Knew Micajah and William Cargill; they regarded each other as brothers.

George Long.—Is acquainted with T. Cargill, Micajah Cargill, and William Cargill. In 1844, Demarias Cargill brought suit against T. Cargill, for maintenance; T. Cargill sent for witness and said he wished to compromise the suit between himself and the old lady; that he had always been, and was still willing to support her. He gave his bond to furnish her with a support, and the suit was dismissed; they then recognized each other as man and wife. Witness has known Mourning Killingsworth for twelve or fifteen years; shortly after he first knew her she moved to T. Cargill's house, and remained with him till his death. Demarias Cargill has not lived in T. Cargill's house at any time since he knew them; T. Cargill, after Demarias Cargill's death, married said Mourning.

David Richets testified on the trial, that George Long and Thomas Cargill were dead.

Petitioners then read in evidence, the transcript of the bill and answer in chancery, before referred to. The bill was filed in July, 1843, and was sworn to by Demarias Cargill; and charged among other things, that said Demarias and Thomas Cargill were married in the State of North Carolina, in 1789 or 1790; that they had lived together for thirty-six years, as man and wife, and had issue,

several children, six of whom were still living. The bill also sets out the conduct of said Thomas, upon which complainant grounds her right to relief prayed for, to wit: divorce and alimony.

The answer was filed in April, 1844, and admits the marriage, issue, and living together, as charged in the bill; but denies all the facts alleged as grounds for divorce and alimony, and resists a decree for complainant.

The answer was not sworn to.

This was all the evidence offered by petitioners, except what is hereafter noticed as having been offered in rebuttal. So much of the testimony of the foregoing witnesses as related to the good character of the Cargill's, and their having been visited by respectable people, was not read by petitioners in their opening examination; but was afterwards read, to rebut defendant's evidence on those points.

Defendants then read the following depositions:—

M. B. Bridges.—Witness knew Thomas Cargill for about seventeen years previous to his death, which took place in 1847; has seen Demarias; they did not live together as man and wife; witness does not know that they ever acknowledged themselves as such. Mourning Killingsworth and Thomas Cargill lived together in adultery for the most of the time above stated. Demarias Cargill lived in the same neighborhood with them since 1840.

W. P. Bridges and Horatio Furguson's depositions were in substance the same as last witness.

Frank Tidwell's deposition, taken in 1854.—Witness became acquainted with T. Cargill about twenty-five or thirty years ago, in Autauga county, Alabama, and from that time knew him till his death, in 1847; don't know that he was ever married until he married Mourning Killingsworth; has heard him say several times, previous to his marriage with M. Killingsworth, that he had never been married; has heard him speak of Demarias Colbert; but he always denied being married to her; never saw T. Cargill and D. Cargill in society together. Witness knew T. Cargill tolerably intimately, and attended to his business in Marshall county, Alabama.

Robert Lewis's deposition, taken in 1854.—Witness knew T.

Cargill from 1840 till his death; never knew of his being married, except to M. Killingsworth; knew D. Cargill in 1844; she said that she was married to T. Cargill, but he always said the reverse.

Mourning Cargill's deposition, taken in 1854.—Witness became acquainted with T. Cargill in Marshall county, Alabama, twenty-five or twenty-six years ago; he and witness intermarried in September, 1846; he said he had not been married previously; and denied frequently that he was married to Demarias; never saw T. Cargill and D. Cargill in society together. Witness' name, before her marriage to T. Cargill, was Mourning Killingsworth; heard T. Cargill tell Micajah Cargill that he had commenced this suit wrong; that he, (T. Cargill,) was the right party to sue. Several years ago, William Cargill staid "with us" several days; T. Cargill said he reckoned William was his son, and that he was the brother of the other children; D. Cargill spoke of William as her son. Before her marriage, witness lived with T. Cargill seventeen or eighteen years; he hired witness at four dollars per month. "We lived together as man and wife, though we had separate beds;" don't know of T. Cargill ever having married any one else; and never heard any other woman claim to be his wife. Demarias Cargill lived about a mile from T. Cargill's, and was friendly with witness, and visited her.

Elijah Looney's deposition, taken in 1846.—Witness has known T. Cargill since 1838; he married Mourning Killingsworth about a year ago; he had previously been living with her; heard T. Cargill say, when speaking of Demarias Cargill's divorce suit against him, that he never was married to her.

C. F. Walthall's deposition, taken in 1847.—Witness knew T. Cargill from 1808 or 1811, to 1813 or 1814; he did not then indicate any woman as his wife, or hold himself out to the community as a married man; he had a woman about him called Demarias; or as she was most generally known, "old Marias;" he did not remove her when he left the county, nor did he return and remove her. He left on account of public excitement against him for living in adultery; he left the woman and children wholly unprovided for. After T. Cargill left Georgia, his family kept a dis-

orderly house, which was visited by the lowest men, for the basest purposes.

Levincy Bailey's deposition was in substance the same as Walthall's.

John Robinson.—Knew T. Cargill from 1810 to 1812 or 1813; don't know whether he was married; he never introduced into respectable society, the woman he lived with on the Ocmulgee, in Jasper county, Georgia; he did not remove her when he left; she and the children remained from four to six years, and then removed to Alabama.

Jesse Aldridge.—Witness became acquainted with Thomas Cargill in Autauga county, Alabama, in 1822, and lived a neighbor to him; was acquainted with the woman who passed for his wife, and also with the children; T. Cargill told witness that he had two children by another woman he had lived with before the one he was then living with; the name of one of these two was Micajah Cargill. T. Cargill lived in Autauga county, seven or eight years; a white woman lived with him a part of this time; but witness does not think she acted in the capacity of a wife; she was refused admission into the Baptist Church in that county, because she would not say, when asked by the moderator, that she was married to T. Cargill. When he moved to Marshall county, this woman did not go with him; she was then living with her son-in-law, Post.

Susan Edwards.—Witness is reputed the natural daughter of Thomas Cargill, by Chanty Jones; she has known T. Cargill from her earliest recollection. When he lived in Georgia he had a woman with him—Demarias Colbert; she did not appear to be treated as a wife; she never heard her father say that she was his wife; respectable people did not visit them. Demarias called witness' father "Thomas Cargill;" she never called, or claimed him as her husband.

James H. Arrington.—Witness visited Thomas Cargill in Marshall county, Alabama, in April, 1847. T. Cargill inquired of witness about his lawsuit in Mississippi; he said he had not heard from it in a long time; that when he last heard from it, it had been lost; said he had told Micajah that he had brought the suit wrong;

that it ought to have been brought in his, (T. Cargill's,) name; that he was the only right heir, and that if said suit was lost, he would revive it in his own name; that there could be no mistake about his being William Cargill's father, and his, (William's,) mother had sworn him to be her son.

Nathaniel Posey.—Knew T. Cargill from 1812 'till he left Autauga county, in 1827; he had a white woman living with him when he first knew him; they were not received into society as husband and wife, nor visited by respectable people; Demarias was refused admission into the Baptist church, in Alabama, because she refused to say, when asked, that she was married to T. Cargill; when T. Cargill left Georgia, D. Cargill and the children remained behind for two or three years.

Ellender Hollander.—Witness knew T. Cargill whilst he lived in Autauga, Alabama; he resided nine or ten miles from witness; does not know that he was ever married; saw Demarias Colbert about the place, but never saw them act as husband and wife; they were not visited by respectable people as man and wife; they did not stay in the same house; she applied to the Baptist church for membership, and when asked if she was married to T. Cargill, she refused to answer.

Mary Calloway.—Witness knew T. Cargill from 1824 to 1828; a white woman, named Demarias, lived with him; he did not hold her out to the community as his wife, nor treat her as a husband would. About 1825, Demarias went to Shelby county, Alabama.

Benjamin Calloway.—Witness knew T. Cargill in 1816, in Montgomery county, Alabama; he then had no white woman with him; when witness next saw him, Demarias was living with him; they lived in separate houses in the same yard; he did not hold her out to the community as his wife.

Job Calloway.—Witness became acquainted with T. Cargill in Jasper county, Georgia, in 1812, and knew him 'till 1827; Demarias lived with him; his general treatment towards her was not that of a husband to his wife; he never went with her to church or elsewhere; she was not received into good society.

Abraham Lemon.—Witness knew T. Cargill in Georgia, from

1812 to 1818; he lived with a woman, but so far as witness knows, they did not hold themselves out as husband and wife.

Samuel Clark.—From 1810 to 1820 witness resided in Jasper county, Georgia, about one mile from T. Cargill's residence on the Ocmulgee river; Demarias was living with him, and was called Mrs. Cargill; she applied to join the Baptist church, and was refused admission; T. Cargill belonged to the Baptist church, and, so far as he knows, was never turned out.

John Jones.—Witness became acquainted with T. Cargill in Wilkes county, Georgia, in 1785; this acquaintance terminated in 1807 or 1808, in Morgan county, in that State; does not know that he was ever married; during a part of that time he had a woman living with him, called Demarias Colbert; he believes they were not married, because he left her and her children when he moved from Morgan county, and because they were not visited by respectable people, and because, during that time, he courted a young lady in the neighborhood.

Catharine Jones, David Jones, and Annis Jones, testified in substance the same as last witness.

William Gillespie.—Is seventy-seven years old, (in 1847); knew William Colbert well, and knew his children; never knew of one called Demarias. If one of his daughters had married T. Cargill, he must have known or heard of it; he never heard of such a wedding. The neighborhood was thinly settled, and he knew all the neighbors. He lives now, and has always lived, in Turkey Cove, in what is now M'Dowell county, North Carolina.

David Gillespie and Ephraim Gray, testified in substance the same as last witness, except that Gray stated in addition, that T. Cargill came to Turkey Cove settlement, in North Carolina, peddling, and staid three or four months. T. Cargill carried off from Linville settlement, Ibby Simpson, under the pretence of having married her; William Colbert only staid a short time in Turkey Cove settlement.

Benjamin Moore.—Witness is eighty-eight years old (in 1853); has resided in Linville settlement in Burke county, North Carolina, for about sixty years; he never knew T. Cargill, but he knew Ibby Simpson; Ibby was married, and had a child before she went

south.   He understood that T. Cargill was arrested for crime and carried off; and that he afterwards came back and carried off Ibby Simpson; understood he was a pedlar.

Frances Master.—Witness has lived in the Linville settlement in North Carolina, forty-six or forty-seven years; knew Ibby Simpson; she went away as the wife of a man named Chyle, who traded in dry-goods; lived within twenty or twenty-five miles of Turkey Cove settlement, and never heard of T. Cargill's marrying there.

James Master stated the same as last witness.

Parmelia Collet.—Witness knew Ibby Simpson, but does not know whether she was married; thinks if the man who carried her off had returned and married in Turkey Cove settlement another woman, she would have heard of it.

James Simpson.—Witness is eighty-five years old (in 1854), and is a brother of Ibby Simpson; she married a man named William Cile, at witness' house, 1792; after the marriage they remained five or six months, and then removed to Charleston, South Carolina, and from thence to Block Island; Ciles's occupation was peddling.   When he left, Ibby went with him; can't say what became of him; she had no child when she left.   Witness lived twelve or fifteen miles from Turkey Cove settlement, and if Cile had come back and married a woman there, witness would have known it; never heard of such a man as Cargill marrying in Turkey Cove, and never knew such a man; don't know how Cile spelt his name.

John D. Ferreer.—Witness is clerk of the County Court of Burke county, N. C.   Has searched the files and records of the office diligently, and can find no trace of a marriage bond of Thomas Cargill, or a license for him to marry Demarias Colbert. He finds many marriage bonds on file, of the dates between 1789 and 1795.

Defendants also read in evidence the Statute of North Carolina, in relation to the solemnization of marriage.   The statute requires of the party applying for license to marry, to execute a bond; and imposes a penalty for marrying without a license.

The petitioners then introduced the following evidence to rebut defendants' proof.

W. C. M. Brown.—Witness knew T. Cargill, in 1822, in Autauga county, Alabama. A white woman lived with him, and appeared to act as his wife; she claimed to be his wife, and he recognized her as such. Mrs. Cargill, left Turkey Cove in 1825.

Jno. D. Wyatt.—Witness knew T. Cargill's family from the time they settled in Jasper county, Georgia, until they left there. They were respectable, and were visited by respectable people. Witness has attended preaching at their house. After T. Cargill left, they did not keep a disorderly house. Jason Cargill, brother of T. Cargill, lived near them, and recognized T. Cargill and D. Cargill, as husband and wife, and the children as theirs.

Hugh Wise's deposition, taken in 1853.—Witness knew Thomas Cargill, and Demarias Cargill, in Jasper county, Georgia, whilst they lived there. Witness resided within two miles of them; does not know whether they were married or not, he looked upon them as married, they lived together as husband and wife; he never had any reason to doubt that they were such. Witness frequently visited their house, and they were visited by as respectable people as any in the county. In answer to the question requiring him to state any thing else that he knows, that will benefit the petitioners: witness states that he understands that the defendants have a deposition purporting to be given by him, and appends a copy of what he is informed is the deposition; (this copy is a correct one of the deposition afterwards read by defendants, in rebuttal of this deposition.) Witness then adds, if such be the case, the said deposition is false; and if he ever signed such a deposition, it was falsely read to him, or else he would never have signed it. That his deposition has heretofore been taken in the case.

Defendant then read to the jury the deposition of Hugh Wise, taken in 1847, in which he stated that T. Cargill, did not hold himself out to the community as a married man. He never indicated any white woman as his wife. He had a white woman living with him named Demarias, or Mary. Said deposition contained various other statements contradictory of the last one.

A motion was made in the Probate Court for a new trial, which

was overruled, and the court decreed distribution according to the prayer of the petition.

*Johnston* and *Shelton*, for appellant.

It is contended by plaintiffs in error, that the verdict of the jury should be set aside and a new trial granted, for the following reasons:—

1. The court erred in rejecting testimony offered by defendant below.

2. The court erred in admitting testimony for plaintiffs below.

3. The court erred in the instructions given in the cause.

4. The verdict is contrary to law, and not authorized by the testimony in the cause.

5. The court erred in refusing to grant a new trial.

The testimony in the cause is so very voluminous, that, of course, it is not practicable, in a brief, to set out even the substance thereof. We shall, therefore, in the argument based upon the evidence in the cause, content ourselves with a mere synopsis of the strong and controlling portions of the testimony; for it will readily be conceded that much of the testimony in the cause, if not actually irrelevant, has very little reference to the real point in dispute.

Micajah Cargill et al., (the petitioners in this case,) applied for distribution, amongst themselves, of one half of the estate of William Cargill, deceased, on the claim that they are the children and the descendants of the children, of Thomas and Demarias Cargill, the ancestors of the intestate. The claim is resisted on the ground that the petitioners are not legitimate descendants of Thomas and Demarias Cargill, and therefore not capable of inheriting from the intestate. The real question in this case—the only question, indeed, and the gist of the whole controversy—is this: were Thomas and Demarias Cargill, husband and wife, lawfully united in matrimony? If they were so, then the claims of petitioners to distribution, to the extent contended for, are confessedly good. If Thomas and Demarias were never married, (as our side alleges,) then, it is equally clear that petitioners have, by law, no interest whatever in the estate of William Cargill.

The court will readily perceive, by reading all the testimony in the cause, that the weight of evidence is against .the supposition of the marriage.	There is no pretence of *record evidence* of any marriage; there is no reliable or satisfactory proof; none whatever, that any marriage ceremony was ever performed.	Although the records, where the marriage is said to have occurred, have been consulted, and do afford evidence of marriages anterior to the date of the alleged marriage of Thomas and Demarias Cargill; still, those records afford no evidence that Thomas and Demarias Cargill were ever married.	We are, therefore, on both sides of the case, constrained to resort to *reputation;* to the *conduct* and *acts* of Thomas and Demarias Cargill, to settle the question, as to whether they cohabited adulterously, or whether they were husband and wife.

It is conceded, that there is some conflict and contradiction in the evidence relating to this important inquiry.	For instance, some of the witnesses for petitioner, say, that Thomas and Demarias were regarded as husband and wife, and were so received in society. On the other hand, many of the witnesses for the defendant below, state that the parties were *not* regarded as husband and wife; but, that on the contrary, the reputation was, that they lived together in adultery.	We repeat, however, that, taking all the evidence together, it is manifest that the weight of testimony is against the assertion of a marriage, and shows that the verdict is manifestly wrong.	It is clear, on well-settled principles, that the burthen of proof in this controversy rests upon the petitioners. They ask for distribution of the estate of William Cargill, saying, that they are his next of kin, and entitled to distribution.	The claim is resisted, and an issue formed.	Of course, a party claiming distribution, must, when a contest arises, *prove himself entitled to distribution.*	To do this, proof of legitimacy is indispensable. It was not for the defendant below to prove that the petitioners were illegitimate; but the petitioners were bound to establish their pedigree, and show their legitimacy.	We shall now proceed to examine, in detail, all the errors which we assign in the proceedings below, and refer the court to the authorities relied upon in support of our positions.

The courterred in permitting the plaintiffs to read the deposition of Elizabeth Cargill. The certificate of the commissioner is clearly insufficient. He merely states that the witness swore to the answers being "correct and true," as "written out," without certifying that the answers were written by the commissioner, or read over to, and approved by the witness, *or signed* by her. It does not appear that the witness was "*duly*" sworn. It only appears by the certificate that she was *sworn.*—How? This deposition is very important. Containing, as it does, very strong testimony in favor of the marriage, no doubt this evidence, improperly admitted, exercised a controlling influence in producing a verdict for plaintiffs.

It must always appear, that a witness residing abroad, was sworn according to the laws of his domicil. Our own Supreme Court, however, have relaxed the rule to this extent, that if the commissioner certifies that the witness was "*duly* sworn," it will be presumed that the law was observed. *Doe dem. Martin* v. *King's Heirs,* 3 How. 125.

The caption of this deposition of Mrs. Cargill does not specify the *cause,* nor the court. For that reason it ought to have been rejected. *Sanders* v. *Howe,* 1 Chip. 363; *Vail* v. *Nickerson,* 6 Mass. 262.

In the deposition of Alcey Bankton, the court, on an objection of plaintiffs, ruled out and excluded the responses to 2d, 3d, 4th, 11th, 14th, 15th, and 16th cross-interrogatories.

All this testimony, thus rejected, tended to show that no marriage had ever occurred between Thomas and Demarias Cargill, and it ought, therefore, to have been admittted.

The same objection applies to the deposition of Gross.

The same objection applies, also, to the deposition of John Price.

The deposition of Milby Rogers, admitted for the plaintiffs as evidence in the cause, ought to have been rejected. It is fatally defective in this: The caption recites a commission "issued out of the Probate Court," when the commission annexed to the deposition issued out of the Circuit Court. Second. It does not appear that the witness was sworn to make true answers to *all* the interrogatories annexed, but to *certain* interrogatories, &c., leaving the

inference, that, in reference to some of the interrogatories, no oath was administered. Third. The commission commands the officer taking the deposition to return it certified under his hand *and seal;* yet, the officer does not affix his seal to the certificate.

The commission is in the nature of a power of attorney. Its essential commands must be pursued. The officer had no power to act, except in the mode pointed out by the commission. Unless certified under his seal, it was no deposition, and ought to have been rejected. Again, it does not appear that the deposition was ever read to the witness, or approved by her as written by the commissioner.

It was erroneous in the court to permit the testimony of Mrs. Moore, S. Bankton and others, as reduced to writing in the Circuit Court of Hinds county, on a former trial of this cause, to be read on the last trial. It is true, that the statute requires such testimony to be written; but, it is no where provided that such a record shall be made evidence in all subsequent investigations of the cause in which it is taken. North on Probate, 36, §§ 8, 9. It is submitted, however, that the direction herein contained, for taking and recording depositions, relates to action in the Probate Court, before the issue is sent down to be tried, and does not relate to proceedings in the Circuit Court.

By our law, regulating trials in the Circuit Court, there are only two modes recognized for the examination of witnesses. One mode, and the usual one, is to examine the witness orally upon the stand, in the presence of the parties. The other mode is, to take written depositions, according to the directions of the statute, when the witness is aged or infirm, or about to depart from the State, or resides without the limits of the State, or is a female. This testimony was not taken according to either one of the two modes known to our law. Hence, it is illegal. We were deprived of our right of cross-examination. This very point was adjudicated by the High Court in this cause, when it was pending here at October term, 1852. 24 Miss. R. 541. It does not matter, whether the objection to this vast volume of illegal testimony, was made on the trial in the court below. If it were not then made,

the court will hear the objection here, for the first time.   1 How. 479; 24 Miss. R. 541.

When this cause was before the High Court of Errors and Appeals, at October term, 1852, it was declared by the court that, where there is conflicting evidence, and on the trial, material, important and relevant testimony has been improperly admitted, which may have influenced the jury in forming their verdict, the *correct rule is* to remand the cause for a new trial.   The court also declare, that without Thomas Cargill's deposition, the case now presented was of that character.   Cargill's deposition was *not offered* on the last trial.   Of course, then, the whole testimony raised a mere conflict, contradiction and doubt, as to the legitimacy of the plaintiffs.   On the last trial, we have now shown that a great amount of illegal testimony on behalf of plaintiffs was admitted. Consequently, observing the rule as laid down in this case by the High Court of Errors and Appeals, the cause must be remanded again.

The next error insisted upon, was the admission in evidence of a certified copy of a bill for divorce, filed in Alabama, by Demarias Cargill, against Thomas Cargill, and the answer to said bill, filed by Thomas Cargill.   The objections to the introduction of that document are the following: First.   It is but *part* of the record, and does not profess to be an entire record.   Second.   The suit for divorce was between persons not parties to the present contest. Third.   The answer was made after this contest arose.   For either one of these objections, the document ought to have been excluded.

A record is an entire thing; it cannot be divided and certified to in fragments.   A party relying upon a record as an instrument of evidence, must produce the whole record, properly certified.   If a party merely wish to show the fact that a *fi. fa.* issued, and a sale occurred under it, he cannot merely produce the *fi. fa.* and return, but must bring the entire record.   1 Phil. Ev. 385; 3 Ib. 1059; 1 Stark. Ev. 288, note; *Newron* v. *Lycon*, 3 J. J. Marsh. 340; *Fitzhugh* v. *Crogan*, 2 Ib. 429; *Killingsworth* v. *Bradford*, 2 Overt. 204.

The court will perceive, by reference to the record, that, in the various depositions of the defendant, matter which was legal and rele-

vant, was excluded by the court. And, for this reason, the verdict should be set aside.

The court committed an error in rejecting the deposition of Nancy Griffeth. The only objection to its introduction, is a difference in the *spelling* of the name of witness. The notice and commission is for taking the deposition of Nancy Griffen, under which the deposition of Nancy Griffeth was taken. The identity of the witness is fully shown, and the deposition ought to have been admitted. Reasonable certainty is all that the law requires in such cases. The name *Griffeth* is usually called Griffin. Indeed, it may be truthfully said that there is no difference whatever in the names. Again, plaintiffs in this case cross-examined the witness (whoever she was) quite elaborately. They, therefore, are not prejudiced by the evidence sought to be introduced.

*T. J.* and *F. A. R. Wharton*, for appellees.

The bill of exceptions contained in the record presents the following points reserved, and which are urged as objections to the action of the court below, viz. :—

1. The admission in evidence of the deposition of Elizabeth Cargill, taken and read by the petitioners.

2. The exclusion of certain portions of the deposition of Alcey Bankton, in answer to cross-interrogatories propounded by the appellant.

3. The exclusion of certain portions of the deposition of Ellison Gross, in answer to cross-interrogatories of the appellant.

4. The exclusion of certain portions of the deposition of John Price, in answer to cross-interrogatories of the appellant.

5. The admission in evidence of Milby Rogers's deposition.

6. The admission in evidence of the bill in chancery, filed in Alabama by Demarias Cargill, (the alleged mother of the intestate and petitioners,) for divorce and maintenance, and the answer to the same filed by Thomas Cargill, (the alleged father of intestate and petitioners.

7. The exclusion of portions of the depositions of Robinson, Walthall, Bailey, Aldridge, Posey, Hollander, M. Calloway, J.

Calloway, B. Calloway, Lemon, Clark, Jno. Jones, C. Jones, D. Jones, and A. Jones.

8. The admission in evidence of the deposition of Hugh Wise, taken by petitioners on the 15th September, 1853.

All the above exceptions were reserved in the progress of the trial of the issue before the jury in the Circuit Court, and are presented in the bill of exceptions, signed by the judge who presided on that trial.

The motion to set aside the verdict which was made in the Probate Court, was based upon these exceptions, the instructions given for appellees, and those refused on the part of the appellant, together with the objection that the verdict was contrary to law and the weight of evidence.

We will notice the exceptions in the order before stated : 1. The admission in evidence of the deposition of Elizabeth Cargill. Four points of objection were urged to the reading of that deposition. First. That the certificate of the commissioners by whom it was taken, does not state that the deposition was signed by the witness; nor, Second. That the answers to the interrogatories were read to, and approved by the witness. Third. It does not appear that she was legally sworn; and, Fourth. The caption does not state from what court the commission issued. Each of these objections can be answered very briefly and conclusively. The deposition itself is *signed* by the witness. The objection is not that it is *not signed,* but that the *certificate of the commissioner does not state that it is signed* by the witness.

We maintain that the foregoing is not a valid objection, either under our statute, (Hutch. Code, 862, 863,) defining the manner in which depositions of non-resident witnesses may be taken, nor under the Statute of Alabama, where the deposition was taken. Our statute, above cited, prescribes that " all depositions taken by virtue of this act, shall be sworn or affirmed to, by the witness or witnesses named in the commission, and examined, and shall be certified by the commissioner or commissioners, or a majority of them, to whom the commission for taking such deposition may be directed, according to the laws, customs and usages of the country, State or territory, in which the deposition is taken ; and the same

so certified, together with every exhibit, or voucher, relative thereto, in the possession of such commissioner, or commissioners, or a majority of them, shall be by them sealed up and directed to the court, or the clerk of the court, where the cause is depending, and from which such commission issued, and transmitted in the most safe and convenient manner," &c.   Not one word is said about the certificate stating, that the deposition was signed by the witness.   The whole matter is left to be regulated by the laws of Alabama, where the deposition was taken.   Referring to those laws we find them silent also on the point.   See 2 S. & P. 35.

The witness actually signed the deposition.   The certificate of the officer taking it, shows that the witness appeared before him—was sworn and testified as set forth in the depositions.   What more could be required to comply with the strictest rule upon the subject?   The commissioner is the officer of the court, appointed to take the deposition.   His certificate, which is his return upon the commission, is the evidence upon which the court will act: it is that which gives efficacy to the proceeding, more than the signing of the deposition by the witness.   The omission to sign it by the witness would not vitiate it, or make it inadmissible in evidence, if the commissioner certifies that he appeared before him, was duly or legally sworn, and testified as stated in the deposition, his answers being read to, and approved by him.   So much on the first branch of the first exception.   The second branch is, that it does not appear that the answers to the interrogatories were read to, and approved by the witness.   In reply to this objection, it is only necessary to quote the language of the certificate of the commissioner, which is as follows :—" The witness being *sworn*, deposes and says, that the answers, *as written out, to the foregoing interrogatories and cross-interrogatories, are correct and true*."   What inference can be drawn from this statement, but that the answers were either read *to* or *by* the witness ? and in either case were approved by him.

The third point relied upon in support of the first exception is, that it does not appear that the witness was *legally* sworn.   We have seen that the commissioner certifies that " the witness *being sworn*," &c.   It is unnecessary to specify *the manner* in which

she was sworn, or the form of oath administered to her. The legal presumption is, that she was sworn in the mode prescribed by law. The maxim, *omnia rite esse acta, applies.* The commissioner was the officer of court, and will be presumed to have acted in conformity to law. The language *"the witness being sworn,"* is equivalent to being *legally,* or *duly sworn.* In *Doe ex dem. Martin* v. *King's Heirs,* 3 How. (Miss.) R. 142, this court said "the commissioner certifies, that the witness was 'duly sworn,' which we think must be understood to mean, that he was properly sworn. The commissioner being the officer of the court, a presumption is to be indulged, that he acted in conformity to law."

In *Wellborn* v. *Younger,* 3 Hawks, R. 205, the Supreme Court of North Carolina hold, that a deposition will not be rejected because it is certified simply that the witness was *sworn to the truth of the deposition,* without stating that he was sworn to testify the truth, the whole truth, and nothing but the truth. The Ch. J., Taylor, delivering the opinion of the court, says:—"The common form of administering an oath is so familiarly known to all persons in any degree conversant with the trial of causes, that it is a very reasonable presumption, that magistrates, who are in the daily practice of transacting such business, are conusant of it; and when they certify on a deposition taken under the authority of a commission, that a witness was *sworn,* a presumption arises, *prima facie,* that he was sworn according to the forms and ceremonial of law."

The 4th and last point presented by the first exception is, that the caption does not state from what court the commission issued. A reference to the language of the caption itself, as set out in the record, will be sufficient to repel such pretence. It recites the names of the parties, and of the witnesses to be examined, and refers to the commission under which the deposition is taken, and in which the name of the court issuing the commission, and where the cause is depending, are set out.

The 2d, 3d, and 4th exceptions taken in the court below, may be considered together, as they all relate to the same subject-matter. The point raised by them is, that it was error to exclude evidence of general reputation and reports in the neighborhood

that the parents of the intestate and appellees were never married. We insisted that evidence of general reputation, recognition of each other as husband and wife, and of the intestate and appellees as their children, must proceed from those related by affinity or consanguinity; in other words, that the proof offered by the appellant, and excluded by the court, being hearsay in its nature, was inadmissible, whilst that admitted in behalf of the appellees consisted of declarations of deceased members of the family upon the same subject, and was entitled to be regarded as *primary evidence*, and not hearsay. An examination of the authorities, both in England and this country, will leave no doubt that the ruling of the court below was correct.

In *Whitlock* v. *Baker*, 13 Vesey, 514, Lord Eldon held, that it is not every statement or tradition that can be admitted in evidence. "The tradition must be from persons having such connection with the party to whom it relates, that it is natural and likely, from their domestic habits, that they are speaking the truth, and that they could not be mistaken." Upon this principle, *declarations in the family*, descriptions in wills, and upon monuments, &c., are all admitted in evidence. Ib. 140, 143, 147; Cowper, 591, 594; 18 Johns. R. 37; 2 Conn. R. 347; 17 Peters, 213; 4 New Hamp. 371.

Greenleaf says:—" The principal question in these cases, is that of the parentage, or descent, of the individual; and in order to ascertain this fact, it is material to know how he was acknowledged and treated by those who were interested in him, or sustained towards him any relations of blood or of affinity." After remarking upon the rule having been long unsettled, and noticing the diverse decisions on the point, he concludes as follows:—" but it is now settled, that the law resorts to hearsay evidence in cases of pedigree, upon the ground of the interest of the declarant in the person from whom the descent is made out, and their consequent interest in knowing the connexions of the family. The rule of admission is therefore *restricted to the declarations of deceased persons*, who were related by blood or marriage to the person, and therefore interested in the succession in question. And general reputation in the family, proved by testimony of a surviving mem-

ber of it, has been considered as falling within the rule." 1 Greenl. Ev. 120, § 103. In the note on the same page, he adds, quoting *Doe* v. *Griffin*, 15 East, 293, that there is no valid objection to such evidence, because it is *hearsay upon hearsay*, provided all the declarations *"are within the family."*

For the same reason, *family conduct*, such as tacit recognition of relationship, &c., is admissible evidence, from which the opinion and belief of the family may be inferred. 1 Greenl. Ev. 122, § 106.

In the *Berkley Peerage case*, 4 Camp. 416, C. J. Mansfield said, that if the father is proved to have brought up the party as his legitimate son, this amounts to *a daily assertion that the son is legitimate.*

In this case, the legitimacy of the appellees and of the intestate is contested. The proof clearly establishes that they were children of Thomas and Demarias Cargill; and the question was, whether their parents were married. A vast volume of testimony, drawn from persons connected with them by affinity or consanguinity, was introduced, establishing the fact that they lived together—acknowledged each other as husband and wife—were so received in society—and also acknowledged the intestate and the appellees as their children. Against the presumption of marriage, drawn from the declarations of the parents, their conduct towards each other, and their children, the appellant sought to introduce the excluded evidence, consisting, as before stated, of rumors in the neighborhood, and the opinions of neighbors, that they were not married, and that their children were therefore illegitimate. The author already quoted at so much length, speaking of the admissibility of *general reputation* to prove the fact of marriage, says, that such evidence cannot properly be called hearsay evidence, but is strictly and truly original evidence of facts, from which the marriage may well be inferred. Of that class is evidence of the parties being received into society as man and wife—being visited by respectable families in the neighborhood—and their attending church and public places together as such, and otherwise demeaning themselves in public, and addressing each other as persons actually married. Greenl. Ev. 123, § 107; 5 Cow. R. 239. See

also 1 Ph. Ev. 234, 235; 2 Ib. 618, 619, 620, 621; 5 Day, 290, 293; 4 Rand. R. 616, 617, 618.

This subject is very elaborately and ably discussed in 2 Ph. Ev. 617, (C. & H. notes), note 466. The author reviews the authorities in England and this country at great length; and after having remarked upon the fact, that of late, great uniformity had prevailed in the English courts, which adhere to the rule that the declarations to be received as evidence must emanate from deceased *members of the family* to which the person whose pedigree was in question belonged, he notices the diversity of opinion in the American courts. He adds, that most of the cases in the latter courts confine the declarations to disinterested relations who are dead, as in *Chapman* v. *Chapman,* 2 Conn. R. 347; *Waldron* v. *Tuttle,* 4 New Hamp. R. 371, 377, 378; and hold that it cannot be extended to acquaintances, however intimate. 4 Rand. R. 616, 619; 18 Johns. R. 37.

The review of the American cases is concluded by this significant remark: " The main current of American authorities is, that general *neighborhood report shall not be received;* but they are not uniform. Many of the practical boundaries of the exception are evidently unsettled; and the safe plan of the practitioner seems to lie within the *restricted lines of the English cases."*

In the case of *Waldron* v. *Tuttle,* 4 New Hamp. *supra,* it is held, that hearsay evidence is admissible to prove pedigree; but this exception to a general rule is confined to what deceased relations, who had no interest to misrepresent, have been heard to say.

The sixth exception taken to the action of the lower court, and assigned for error here, is, to the admission in evidence, of the transcript from Alabama, of a bill in chancery, filed by Demarias Cargill against Thomas Cargill, for divorce, and his answer thereto. The record shows that the bill was filed before the death of the intestate, William Cargill; the answer after that time. Two positions are assumed in support of this exception. First. That the transcript is not certified to be a full, true, and perfect copy of the whole record. Second. That it is matter *post litem motam.*

The first position above noticed has been frequently the subject of adjudication in this court. The first time the question was pre-

sented for decision was in the case of *Doe ex dem. Starke* v. *Gil-dart & Morris*, 4 How. 276. The lessor of the plaintiff in that case, (which was an action of ejectment,) as evidence of his title, introduced on the trial a decree in his favor, which was read without objection. He then offered to read a certified transcript of the same decree, and the execution thereon, both certified by the Clerk of the Chancery Court, and the deed from the sheriff to the land in controversy, which had been sold by the sheriff under that execution. The defendant objected to the admission of the certified transcript of the decree and execution, and also to the admission of the deed. The objection was sustained. The plaintiff took his exception and removed the cause to this court.

One of the grounds of objection was, because the decree alone was produced, and not the whole record. After noticing the authorities which require that a claimant under a sheriff's sale must produce the judgment and execution, and the reason for the rule, and what is to be understood by it, this court proceed to remark : "Do they mean an exemplification of the whole record, or only of the judgment ? The question may be readily solved by an inquiry into the reason of the rule. A judgment imports verity—is conclusive in its character—admits of no question. An execution has none of these attributes, . . . without a judgment to support it, it is void. As its efficacy depends upon a judgment, the judgment can only be required for the purpose of proving the legal existence of the execution. It can be required for no other purpose; for if the judgment be ever so irregular, its imperfections cannot be attacked collaterally. It can be of *no use,* therefore, to produce *the whole record,* and the law does not require that *to be done which is useless.* The decree in this case shows all that could be required. The parties were in court, and the subject-matter was within the jurisdiction of the court, and a final decree was made."

It came up again in *Cockerel* v. *Wynor,* 12 S. &. M. 122. In this, as in the case just noticed, the defendant in error brought ejectment for land which he had purchased at sheriff's sale. To prove title in himself he introduced the judgment, the execution,

and the sheriff's deed. The objection made in this court was, that the *judgment*, and not the *whole record*, was introduced.

This court then said: " the precise point now under consideration was raised in *Starke* v. *Gildart & Morris*, 4 How. R. 267. The decree alone, then, was introduced without the bill and answer, and this was held sufficient. And in *Carson* v. *Huntington*, 6 S. & M. 111, we hold that a copy of the judgment, and of the *venditioni exponas*, emanating from that judgment, constitute *all that is necessary*." See also, *Lowry & Harris* v. *M'Durmott*, 5 Yerger, R. 225; 2 Bac. 613; 14 Ala. R. 408; 7 Johns. R. 516, 518.

In the case from 14 Ala., (*Smith* v. *M'Gehee*,) the court said: " the copy of the bill being read, for the purpose of showing the admissions of the defendant, was the whole of the record which concerned the matter in question; and while the court would not permit garbled extracts of the proceedings to be read as evidence, yet, when the whole of the record, which could, by possibility, have a bearing upon the case before the court, is presented, there is certainly no sound reason for its exclusion." 14 Ala., (new series,) 408, 409. See also, 3 Ph. Ev. (C. & H. notes,) 924, 1059; 1 Marsh. (Ky.) R. 93; 7 Cow. R. 434; 5 Wend. R. 385.

The bill and answer were introduced as proof of the marriage. They were the *only part* of the record *which related to that point, and therefore the only parts which were admissible.*

The second point urged in support of the objection is, that it is matter *post litem motam*. To determine the force of this objection, it is necessary to recur to the proof in the record. It is proved that William Cargill died in November, 1843. The bill in chancery, in Alabama, was filed 22d July, 1843. The application for distribution, out of which this contest originated, was filed in the Probate Court of Hinds county, in July, 1845. One of the petitioners, Micajah Cargill, residing in Alabama, visited Mississippi in 1844, for the purpose of reducing to possession, his own and the distributive shares of the other petitioners, whom he represented as agent. The widow of the intestate was administratrix. She received Micajah, and introduced him to persons visiting her house as the brother of her deceased husband, regretting that twelve

months had not elapsed from the grant of administration, and that distribution could not be made according to law.

She suggested to J. M. Graves and P. W. Garrett, who were co-administrators with her, that Micajah was a poor man, had travelled a long distance and at heavy expense to him, and that they should advance a portion of what he would be entitled to on division of the estate. They assented to this, and advanced him $1000 in cash, and a note for $1000; taking his receipt therefor, as for so much of his distributive share of the estate.

It was also proved that the intestate, William Cargill, in his lifetime, recognized Thomas Cargill as his father; Micajah as his brother, who had visited him, being received and introduced to society by him, as his brother; that he received Mrs. Lewis into his family as his sister; when a child, raised and educated her; that she was married at his house; that they.always acknowledged each other and were received into company as brother and sister.

From the foregoing summary, it appears that the intestate, William Cargill, was alive when said bill was filed; that so far from any controversy of this kind arising, there was no estate for distribution; there was no contest about the relationship of the parties, between themselves or others. The administratrix, Mrs. Cargill, afterwards Mrs. Ragan, was the only person interested in raising the question of the legitimacy of her husband, and of his brother and sisters; as, under our law, the husband having died without issue, she was entitled to one-half the personalty, the brothers and sisters to the other half; and in default of the latter, or other relations recognized by the statute, she would take the whole estate. She did not, at that time, anticipate such a contest; for we have seen that she had recognized their legitimacy, in that she had, as administratrix, paid him $2000 in money and a note. And even in her answer to the petition for distribution, which she filed in August, 1845, she does not state that *they were illegitimate,* (although, in that answer, praying for the very issue which was made up, and on which this case was tried,) but she only states that she "does not know whether petitioners (appellees,) are the legal distributees of the intestate, or not; she therefore insists upon strict proof that the persons claiming distribution are entitled

to receive what they demand; that she is more inclined to insist upon this, from the fact that doubts have been suggested whether they have any legal claim whatever to distribution of William Cargill's estate." This strips the objection of the least plausibility. It is true, that the answer had not been filed by Thomas Cargill to the bill when the intestate died; it was shortly afterwards. But, in the face of the above facts, and many others presented by the record that cannot affect the question, it is reasonable to infer he had not then heard of William Cargill's death. But no matter. How could he anticipate that the widow, the only person, as before shown, interested in bastardizing her husband and his brothers and sisters, would raise that issue when, by all her previous conduct and declarations she had expressly recognized, at least, two of the appellees, Micajah, and his sister Margaret Lewis, as legitimate brother and sister of her husband. The objection, therefore, in no aspect in which it may be viewed, can prevail. As to the remaining point, that the bill and answer were "*res inter alios acta,*" there is as little foundation for that to rest upon.

The bill and answer were introduced for a two-fold purpose. First. To establish relationship—marriage of the parties, the birth, recognition and identity of the children of that marriage. In that light it was admissible as original evidence; being the declarations of parents who were dead at the trial of the cause, as the proof shows, on the question of pedigree on the relationship and legitimacy of the intestate and appellees. Second. It was admissible as rebutting evidence. The record shows that the appellant had introduced witnesses who were permitted to relate declarations loosely made, without regard to time, place or circumstances, by Thomas Cargill, that he was never married to Demarias Cargill, the mother of the appellees; but that his cohabitation with her was meretricious. If he had made such declarations, it was surely competent for us, in rebuttal, to show that he had made *counter declarations* under much *more solemn circumstances,* and greatly against his pecuniary interests.

As to the general doctrine on the subject of " *lis pendens,*" see 1 Greenl. Ev. 160, §§ 131, 132, 134; 1 Ph. Ev. 248; 2 Ib. 613, 625; 1 Stark. Ev. 64; 1 Peters, R. 328.

It will be noted, that this contest did not arise for nearly two years after the death of William Cargill.

The doctrine we insist upon will be found fully sustained in 1 Ph. Ev. 240, 238; 4 Ib. 287. The author states the rule thus: "The declarations of a deceased person, as to the fact of his marriage, or as to the time of the marriage, or to prove that a child was born before or after marriage, are admissible in evidence on a question of pedigree; and the declarations of a deceased member of the family are evidence upon the same point." See also, Bull. Nisi Prius, 112; Cowp. 591.

The next, the seventh, exception reserved on the trial in the court below, relates to the exclusion of certain portions of several depositions offered by appellant. It embraces the very same point presented by exceptions 2d, 3d, and 4th, which has been already fully considered, viz: the admissibility of neighborhood rumors that Thomas and Demarias were not married, but were living in a state of fornication; that he, Thomas Cargill, was a man of infamous character, &c.

We dismiss it, therefore, without further remark; it being clear that these portions of said depositions were properly excluded.

The eighth exception is to the admission in evidence of the deposition of Hugh Wise, taken by us on the 15th Sept. 1853, on the ground that no order of court to retake it was obtained. This objection was not insisted upon in argument; we only note it because it is embodied in the bill of exceptions. The only ground taken in the court below was, that his deposition had been previously taken by the opposite party, and that no order of court was obtained for retaking. This was subsequently waived by the party, and he cannot now object in this court. Some objection was made that the certificate of the commissioner states that the witness was "sworn to make true answers to the interrogatories attached to the commission; and also because the certificate does not state that the deposition was not out of his possession until sealed," &c.

These objections are too futile to spend time upon. They have been sufficiently answered, however, in our reply to the objections raised against the admissibility of Mrs. Elizabeth Cargill's deposition. The law presuming that the commissioner discharged his

VOL. II.—26

duty, it is for the party objecting to show that the deposition was out of the commissioner's possession before being sealed, and what alterations, if any are alleged, were made after the witness was examined, and before the deposition was sealed up and forwarded. There is one other exception in this connection, not noted in our enumeration, which we will here present.

An exception was reserved to the exclusion, when offered in evidence on the part of the appellants, of the deposition of Nancy Griffith. The interrogatories and the commission returned with this deposition named Nancy *Griffin,* as the witness to be examined. The commissioner certifies that he caused Nancy *Griffith* to come before him, and proceeded to examine *her* on the interrogatories. The name of the witness signed to the deposition is Nancy *Griffith.* It was properly excluded. The names are distinct in their spelling and pronunciation. The first syllable is the same in each, the second totally different. There is no "*idem sonans*" about them.

"A commission to examine witnesses was directed to George Dun*lair.* The depositions are not admissible if taken by George Dun*bar,* though there is reason to believe they were taken by the person intended." *Breyfogle* v. *Buckley,* 16 Serg. & R. 264.

Another point of objection urged against the admission of one or more of our depositions, and overlooked in our enumeration of the exceptions, was, that no seal was attached to the commissioner's name signed to them, and that this was a fatal omission—this is noticed in the 5th exception. The statute regulating the taking of depositions, (Code 862, 863,) does not require that the commissioner should have attached a seal to his name. It only requires, that after the deposition has been reduced to writing, the commissioner shall seal up the package containing it; also, the commission, interrogatories, and cross-interrogatories, and all exhibits or vouchers sent with them to him, and address the same to the court, or the clerk of the court where the cause is depending, &c. That is the only sealing required.

In *Francis Ward* v. *Horace Ely,* 1 Devereux, Law R. 372, the Supreme Court of North Carolina held, that "a deposition must be sealed up by the commissioner, so as to prevent inspection or

alteration; it need not be certified under the seal of the commissioner." Noticing the objection that the deposition was not certified under the seal of the commissioner, they say: "if, by this is meant, that seals were not affixed *to their names*, we cannot think the objection a good one, if, from their certificates, it appears that they acted in the character of commissioners."

The ninth exception embraces the objections to the instructions given to the jury on behalf of the appellees. There were six in number, and they have been, in the main, already considered by us in discussing the exceptions reserved to the admission of evidence offered by the appellees; for the instructions are based particularly upon the points of evidence which the appellants sought in vain to exclude.

The first states a proposition which is not controverted, viz: that proof that a man and woman live together as man and wife, if not rebutted, is conclusive evidence of their marriage.

The second is, that where they live together as man and wife, acknowledging and treating each other as such, the *presumption* is that they have been lawfully married; and this presumption becomes the stronger when they are regarded and treated by their relations as man and wife; and the more so when they have children, and own them as such, and give them the family name.

This instruction was objected to chiefly on the ground that it is assumed to be an instruction to the jury on the weight of evidence. There is no foundation for such an assumption. It asserts *three presumptions*, which the law raises upon a given state of facts, all pointing to an *actual marriage* between parties. First. Who live together, and treat each other as man and wife. Second. Who are regarded and treated by their relations as man and wife. Third. When they have children, and own them as such, and give them the family name.

Now, the instruction only states a *truism*—that *each* of the above facts affording a *presumption* of marriage, a combination of them all strengthens the presumption created by each.

That such presumption is created by the state of facts assumed as the basis of the instruction, cannot be successfully denied. Every presumption will be indulged in favor of *innocence and*

*legitimacy.* If, in reference to mere pecuniary transactions, the salutary maxim prevails, " *Odiosa et inhonesta non sunt in lege præsumenda, et in facto, quod in se habet et bonum et malum, magis de bono quam de malo præsumendum est,*" how much the more shall it be applied to the most sacred domestic relations ?

So far, indeed, is it carried in the particular last noticed, that in an action on a promissory note, given to the plaintiff by the defendant, in consideration of the plaintiff marrying his daughter, the defence was, that the marriage was not a legal one ; the plaintiff having married the daughter when he was under age, and without the consent of his parents, or guardian. It was proved, that when the plaintiff came of age, the wife was lying on her death-bed, and that she died in three weeks afterwards. The jury, nevertheless, *presumed* a *subsequent legal marriage,* and the court refused to set aside the verdict. 3 Starkie, Ev. (ed. 1830,) 1248.

So where a woman married again, within twelve months after her husband had left the country, the presumption of innocence was held to preponderate over the usual presumption of the *continuance of life.* 3 Starkie, Ev. 1249, (margin;) 3 East. 192 ; 10 Ib. 211.

In *Senser and others* v. *Bower and Wife,* 1 Penna. R. 450, the court held, that for civil purposes, reputation and cohabitation are sufficient evidence of marriage ; and in all cases of conflicting presumptions on the subject of legitimacy, that *in favor of innocence* shall prevail.

We quote the impressive language of the court ; speaking of the weight this presumption of innocence should have with the jury, they say : " *they were bound to make every intendment in favor of the plaintiff's legitimacy, which was not necessarily excluded by the proof.*" See also, 4 Ph. Ev. 286, 287 ; 1 Hill, (N. Y.) R. 270.

In the case last cited, (*Starr* v. *Peck,* 1 Hill, (N. Y.) R. 270,) the Supreme court of New York held, that cohabitation between a male and a female, is to be presumed innocent and lawful, until there are circumstances marking the case as one of prostitution. They further say, that, " on a question of the legitimacy of A., it appeared that her parents had been intimate in the way of courtship for nearly a year before her birth ; that they intended to be mar-

ried; that the father, being a sea-faring man, left, on a voyage, and was accidentally detained longer than he expected; that A. was born a few days before his return; that within a week or so after, they were publicly married by a clergyman; that they subsequently cohabited as husband and wife for many years; and until their separation by death, always treated A. as their legitimate child: held, sufficient to warrant a jury in finding that a marriage in fact existed previous to A.'s birth, notwithstanding the ceremony which took place afterwards." They also held, that the presumption of innocence is almost as strong in respect to alleged acts of *immorality*, as in respect to the commission of crime, and that breaches of private duty, negligence and fraud are not to be presumed. See also, *Emmett* v. *Norton*, 8 Carr. & P. 506; *Rex* v. *Twyning*, 2 B. & A. 386.

The third instruction given to the appellees and objected to by appellant, asserts, that counter declarations, made by such man and woman, except such as are made under circumstances of peculiar seriousness and solemnity, will not suffice to overthrow such presumption of marriage, much less will circumstances in the conduct of the parties, which excite merely a suspicion that no marriage was celebrated.

The proposition contained in that instruction is susceptible of the clearest demonstration, without reference to adjudications upon the subject. But as our argument has been necessarily very much extended in noticing the innumerable objections and exceptions of our adversaries, and as we have at hand controlling authorities, we content ourselves with citing them.

The instruction is copied *literally* from a work of standard authority—Matthews on Presumptive Evidence, 285, which cites in support of the text, *Goodright* v. *Moss*, Cowp. 591; 8 Mod. 180; Shrewsbury Sum. As. 1822, before Garron, B. He states further, that even the preamble to an act of Parliament, reciting that the husband was then unmarried, has been held incompetent to destroy the presumption. See also 1 Salk. R. 119; 4 Term R. 468. Lord Kenyon said in this case, "Though the first marriage *was defective*, a subsequent one might have taken place; the parties cohabited together for a length of time, and were treated by the defendant (the

woman's father) himself as man and wife; these circumstances afforded a ground on which the jury presumed a subsequent marriage."

The fourth instruction given to the appellees, and excepted to by appellant, declares that declarations of deceased members of the family are evidence to show relationship and pedigree; reputation in the family is also evidence to prove relationship and pedigree; but the jury must disregard all proof of neighborhood reputation, reports and rumors, as to the non-existence of such marriage, relationship, and pedigree.

We have already elaborately investigated the proposition enunciated in this instruction, in our examination of the first exception reserved, which related to the admissibility of certain portions of Mrs. Elizabeth Cargill's deposition, and therefore pass from it.

The fifth instruction to which appellant reserved an exception, is as follows:—" proof that neighbors refused to visit the parties on account of reports that they were not married, is no evidence of the truth of such reports."

No stress was laid upon this by opposing counsel. It states a proposition too clear for argument. It certainly is no proof *of the truth* of a rumor, that a man and woman who live together as such, are not man and wife, *that persons do not visit them* on account of *having heard* such reports.

The sixth and last instruction to which exceptions were reserved, only asserts the affirmative of the issue, viz., that "if the jury believe from the evidence that the plaintiffs, or petitioners, are the legitimate brother and sister, nephews and nieces of Wm. Cargill, born in lawful wedlock, they will find the issue for the plaintiffs." That only states what proof was requisite to support the action of the appellees.

We have dwelt so much at length upon the legal principles involved, that we waive the remaining point as to the preponderance of evidence against the verdict, satisfied as we are, that upon looking into the voluminous testimony on both sides, your honors will agree with us, that not only is there an overwhelming weight of evidence in favor of the verdict, but that the jury would have stultified themselves by finding a different one. We say with

confidence, that dispensing with all the testimony adduced by the appellees, we can maintain their right to a recovery upon a single deposition, taken by our opponents themselves. We refer to the deposition of Mrs. C. M. Brown, taken, but not read by them, and offered by us. She is wholly unimpeached. She distinctly proves that, for a long series of years, the parents lived together, acknowledging and treating each other as husband and wife; visited and received into society as such; gives the names of the appellees; their children acknowledged to be such, bearing the family name; and that she never heard a suspicion to the contrary, though living a near neighbor, until after this controversy arose, when rumors were put in circulation that their connection was meretricious. But we forbear; and submit the case, with the confident assurance that your honors, upon a full examination of the record, will hold that no error has intervened in the proceedings of the court below, and will affirm the decree.

*George L. Potter,* on same side,

Filed an elaborately written argument, reviewing all the evidence, and discussing the questions of law involved in the cause.

SMITH, C. J., delivered the opinion of the court.

The appellees filed their petition in the court of Probate of Hinds county, praying distribution of the estate of William Cargill deceased. They claimed one-half of the estate; and alleged that they were the brother and sister, and children of his deceased sisters. It was admitted by all the parties that William Cargill died on the 12th of November, 1843, intestate and childless, leaving a widow. Administration was granted on his estate to the widow, Mrs. Cecilia Cargill, John M. Greaves and P. M. Garrett. In their answer to the petition of the appellees, these parties averred that they did not know whether the petitioners were the legal distributees of their intestate or not; and required strict proof of their heirship. An issue to try the question whether the petitioners were, as next of kin, entitled to distribution of the intestate's estate, was ordered and sent for trial to the Circuit Court of said county. The issue was determined by the jury in favor of

the petitioners: upon the record of the proceedings had in the Circuit Court, in regard to the trial of the issue being certified back to the Court of Probates, a motion was made for a new trial; which being overruled, and distribution decreed, an appeal was taken to this court.

The appellees, as alleged in their petition, are the brother and sister, and the children of the deceased sisters of the whole blood, of the intestate.    The question whether the appellees were the next of kin of the deceased, and as such entitled to distribution of his estate, depended, necessarily, upon the fact of their legitimacy, which could only be established by proving that a legal marriage existed between Thomas Cargill and Demarias Cargill, alleged to be the immediate and common ancestors of the intestate, and the appellees.

On the trial of the issue no documentary evidence, direct, as to the fact of marriage, and no witness was examined by whom it was proved directly, that a marriage had taken place between the alleged father and mother of the parties.    But the fact that a marriage had been legally consummated between them was attempted to be established, by evidence that they lived and cohabited as husband and wife, for a period of more than thirty years; that during this time they recognized each other as husband and wife; and were recognized as such by their immediate family connexions; that during the same period the appellees, or their mothers (the deceased sisters of the intestate) were born; as well as the intestate himself; and were treated, recognized, and reared as their legitimate children; that the appellees, or their mothers, were recognized and treated by the intestate as his brother and sister; by proof that many years after the birth of the youngest of her children, the mother of the parties, in her bill in chancery for a mainte-nance, filed against their reputed father, and sworn to by her, alleged that a marriage had been legally solemnized between the complainant and defendant; that they lived together as husband and wife, from the date of the marriage, for a period of more than thirty-five years; and that during the time of their cohabitation, they had born to them many children, six of whom were then

living; and finally by proof that the defendant in his answer to the bill, distinctly admitted the truth of these allegations.

In all cases, except in actions of *crim. con.*, and prosecutions for bigamy, the fact of marriage may be established by evidence of the acts and declarations of the parties, by proof of the general repute in the family, and by proof of the declarations of deceased persons, who were related to them by blood or marriage. It will therefore not be contested, that the evidence for the petitioners which was allowed to go to the jury, was sufficient if uncontradicted, to prove the fact of a legal marriage between Thomas and Demarias Cargill; and of consequence sufficient to prove the legitimacy of their offspring.

On the other side, it is insisted that the evidence establishes, conclusively, the illegitimacy of the children of Demarias Cargill, and consequently, that the issue should have been decided adversely to the petitioners.

It is not our purpose to examine in detail the voluminous testimony in the cause, and by a minute comparison of the evidence adduced by the respective parties to determine the degree of preponderance which exists. We deem it sufficient to announce, after a careful examination, that in our opinion, the verdict is sustained by the greater weight of evidence.

We will next examine the questions arising upon the exceptions of the appellant to the admission and rejection of evidence on the trial. And first, we will notice the objections to the admission of evidence.

The deposition of Elizabeth Cargill was offered in evidence and objected to, but the objection was overruled, and the deposition was read to the jury.

Several reasons were urged in the argument, at bar, in support of this exception. These reasons are, that the certificate of the commissioner does not state that the deposition was signed by the witness; that it does not state that the answers to the several interrogatories were read to the witness, and approved by her; that it does not appear that the witness was legally sworn; and that it does not appear, from the caption of the deposition, in what cause or from what court the commission was issued.

The deposition of a witness residing abroad, taken by virtue of the statute, should be sworn or affirmed to by the witness, and certified according to the laws, usages, and customs of the State or territory in which it is taken. Hutch. Dig. 862. But it seems that the law of Alabama, where the deposition was taken, has given no specific directions on the subject. 2 S. & Porter, R. 35. Our own statute contains no other directions in reference to the question than those above referred to. There can, however, exist no doubt that the deposition ought not to have been ruled out for the reason that it is not stated that it was signed by the witness. For, it is not the act of signing, but the certificate of the commissioner, showing that the testimony of the witness was delivered under the sanction of an oath, which gives validity to the deposition. The deposition under consideration was, in fact, signed by the witness, although the act of signing is not certified. The objection, at best, was therefore extremely technical.

In *Doe ex dem. Martin* v. *King's Heirs*, where the commissioner certified that the witness was "duly sworn," it was held, by this court, to be equivalent to a statement that the witness was sworn agreeably to the directions of the law. The court say, "the commissioner being an officer of the court, the presumption is to be indulged that he acted in conformity to the law." 3 How. 125. And in *Wellborn* v. *Younger*, it was said that "where a magistrate certifies, on a deposition taken under the authority of a commissioner, that the witness was sworn, a presumption arises, *prima facie*, that he was duly sworn, according to the forms and ceremonies of law." 3 Hawk. (N. C.) R. 207.

In the case under consideration, it is stated in the certificate of the commissioner, "that the witness being sworn, deposeth and saith, that the answers as written out to the foregoing interrogatories and cross-interrogatories, are correct and true." It is also stated that the deposition was "sworn to" before the commissioner. The objection, therefore, that the deposition was not sworn to according to law, is untenable. 3 M'Lean, R. 94.

The objection that the deposition does not appear, from the certificate, to have been read to, and approved by the witness, is also unfounded.

Henderson v. Cargill et al.

The statement that the witness deposed to the correctness and truth of her answers to the interrogatories and cross-interrogatories "as written out," clearly implies that they were either read by or to the witness. But independent of this statement, we would be bound to infer that, if necessary, the deposition was read to the witness before it was sworn to, upon the general presumption which prevails in favor of the acts of public officers. 3 Phil. Ev. Hill & C. 452, note 285; 4 Ib. 133, note 71.

In the introduction or caption of the deposition, it is stated that the witness personally appeared and severally answered certain interrogatories and cross-interrogatories as propounded by the respective counsel, &c., "in a certain case as stated in the commencement of the foregoing interrogatories." By reference to the interrogatories appended to the commission which issued to take the deposition of this witness, and which were returned annexed to the deposition, no doubt can exist either as to the court whence the commission was issued, or as to the cause in which the deposition of the witness was taken. This is all that the law required. This, the last objection to the deposition, is therefore without any foundation whatever.

The next exception which we shall consider, applies to the deposition of Milby Rogers.

It is objected to this deposition, that it is recited in the caption, that a commission "issued out of the Probate Court," whereas, the commission to which the deposition is annexed, issued out of the Circuit Court.

This objection is based upon what appears to be a clerical misprision. By the addition of the letter (d) to the word (issue,) in the second clause of the caption, it is made to designate the court whence the commission issued, instead of the court from which the issue was sent. But if it were considered that there was no mistake, in our opinion, no valid objection on that ground can be made to the deposition. The question is one of fact; whether a commission issued from the Circuit Court of Hinds county, to take the deposition of the witness; and whether, by virtue of such commission, the deposition was taken and returned. The caption states expressly that the deposition was taken by virtue of a commission

directed to the commissioner, from the Circuit Court of Hinds county.   The deposition was taken by him, and returned annexed to the commission.   Here there was no ground to doubt as to the source whence the commission did, in fact, emanate, or as to the authority under which the commissioner acted.   Under these circumstances, it would be most unreasonable to hold, that by the insertion of the words, "issued out of the Probate Court," the deposition was vitiated; when no doubt could thereby have been created as to any material question.

The deposition shows upon the face of it, that each of the interrogatories annexed to the commission was propounded to, and answered by the witness.   And the certificate shows that the deposition was sworn to and subscribed by her.   There is, therefore, no force in the objection, that it did not appear that the witness was sworn to make "true answers to all the interrogatories."

The deposition was certified by the commissioner, without attaching a seal to his signature.   This is made the ground of the last objection to this deposition.

The statute of this State prescribes no form in which the depositions of persons, residing beyond her jurisdiction, shall be certified to our courts; but directs that they shall be certified by the commissioner taking them, according to the laws, usages, and customs of the country, State, or territory, in which they are taken.   We are not informed, whether, according to the law of the State of Georgia, where this deposition was taken, the seal of the commissioner, attached to his signature, is essential to the validity of his acts.   The question must therefore be determined without reference to any statutory provision on the subject.   And looking at it as a subject in regard to which no rule has been laid down by legislative authority, we are unable to perceive any reason why a seal should be held requisite to the validity of the commissioner's certificate.   Unofficial persons, and persons holding offices, to which no official seal is attached, are frequently, in fact most generally, appointed commissioners to take depositions.   In such cases, it is manifest, that no useful or valuable purpose could be effected by requiring a scrawl or the private seal of the party to be affixed to the signature.   It would certainly not add additional solemnity to the

act of the commissioner in certifying a deposition, nor could it increase the probability or certainty, which is the main point, that the party certifying was the party appointed by the commission to take the deposition. It is true, that the commission which issued in this case—and it is in the usual form—required the commissioner designated therein, to return his examination of the witness "under his hand and seal." But this direction, contained in the commission, cannot be considered as laying down a rule obligatory upon the commissioner, which, if not observed in this respect, would render his certificate void, and of consequence, vitiate the deposition. This view of the subject is fully sustained by the decision in the case of *Ward* v. *Ely*, 1 Dev. Rep. 375.

The petitioners offered in evidence a certified transcript of the bill and answer thereto, in a suit in chancery, brought by Mrs. Demarias Cargill against Thomas Cargill, for a divorce and maintenance. To the reading of which the respondant objected, but the objection was overruled. This action of the court constitutes the subject of the next exception.

Three reasons were assigned in support of the objection. First. That it did not appear from the certificate, that the transcript offered in evidence "was a full and complete transcript of the record of said suit." Second. It related to matters between persons not parties to this suit; and, Third. That the bill was filed during the last illness of the intestate; and the answer not until after the pending controversy had arisen.

The copy of the bill and answer was offered by the petitioners, for the purpose of proving the declarations and admissions of Thomas and Demarias Cargill, in relation to their alleged marriage. These, or similar statements and admissions of the parties, unless made subsequent to the commencement of this controversy, were unquestionably competent evidence in the cause to prove the fact of their marriage. Hence, it is not to be questioned, that they were properly provable by a certified copy of the record, although the persons interested in this controversy were not parties to that suit.

The bill and answer were the only part of the record which concerned the matter in question; and consequently all that could

have been legally read in evidence. While garbled extracts of the proceedings would not be permitted to be used as evidence, yet, when the whole of the record, which could have any bearing upon the case before the court, is offered, there seems to be no good reason why it should not be admitted. And such is the rule settled by the authorities. *Starke* v. *Gildart et al.*, 4 How. Miss. R. 267; *Cockerell* v. *Wynn*, 12 S. & M. 122; *Smith* v. *McGehee*, 14 Ala. R. 404; *Gardner* v. *Col. M. Co.*, 7 Johns. R. 516.

What we have above said, disposes of the first and second exceptions taken to the introductions of this evidence. And we proceed to consider the third objection.

The bill in question was filed by Demarias Cargill, against her alleged husband, on the 22d of July, 1843. The intestate, although in bad health, was then living, and did not die until the 12th of November following. His whole property was subject to any testamentary disposition which he might choose to make of it; and it is unnecessary to say that it could not have been known either when he would die, or whether he would or not make any disposition of his estate, which would supersede the statute of distribution. Nothing was then said or thought of, so far as it is shown by the evidence, about an expected controversy in regard to his estate, in which his own legitimacy, and that of his brother and sister, would be involved. There is, therefore, no pretence for the assertion that the suit of Mrs. Cargill, brought ostensibly for a maintenance, was, in reality, instituted for the purpose of proving that a marriage had been legally solemnized between Thomas Cargill and herself, with a view to affect the rights of any party to this contest.

But the answer of Thomas Cargill was not filed until the 23d of April, 1844; some months after the intestate's death. And the question is made whether the admissions in the answer of the truth of the allegations of the bill, in regard to the marriage, should not have been excluded, on the ground that they were statements or admissions made *post litem motam*.

The petition for a distribution of the intestate's estate, was filed on the 29th of July, 1845. The respondents, one of whom, as we have seen, was the widow of the intestate, in their answer to the petition, say, they do not know whether the petitioners "are the

legal distributees of their intestate or not; and inasmuch as respondents are uninformed on that subject, they insist upon strict. proof being adduced to the court that the persons claiming distribution are entitled to receive what they demand. Respondents are more inclined to insist upon this course, from the fact that doubts have been suggested to them whether said petitioners have any legal claim whatever, to distribution of William Cargill's estate."

Whence these doubts originated, or upon what they were founded; whether upon the supposed illegitimacy of the intestate of the petitioners, or those through whom they claimed, or upon the fact that there were other persons supposed to be the nearest of kin, is not stated in their answer. And it may be a circumstance of some importance in the consideration of the question, that the answer contains no statement touching the illegitimacy of any party concerned.

The proofs do not show at what time the idea was first entertained of contesting the claim of the petitioners, upon the ground that either the petitioners or the intestate were of spurious birth. The evidence is, however, clear, that some months after the intestate's death, his widow, the only person who could have the smallest possible pecuniary interest, in bastardizing her husband, or his brother and sister, recognized one of the petitioners as the brother of the decedent, and as a distributee of his estate, and paid him a portion of his share of the estate, before he could demand a distribution. These acts of the party most interested, clearly and conclusively excludes the supposition, that there then existed either an actual contest or an anticipated controversy, in regard to the property of the intestate, which involved the illegality of the connection which had subsisted between Thomas and Demarias Cargill, and the consequent illegitimacy of the intestate, as well as the petitioners.

The transcript of Thomas Cargill's answer, as we have before shown, was competent evidence for the purpose intended, unless it were shown to have been filed subsequently to the commencement of this controversy. The *onus*, therefore, lay upon the respondents, who made the objection, to establish the conditions upon

which it would be rendered incompetent. This they have failed entirely to do. On the other hand, the evidence is clear, that for months after the intestate's death, in the broadest and most comprehensive signification of the term, no controversy had arisen in regard to any point involved in the issue tried by the jury.

If, therefore, it were conceded that the allegations and statements in reference to the marriage of Thomas and Demarias Cargill, contained in their bill and answer, are not in their nature original evidence of the fact of marriage, but strictly of the character of hearsay, and therefore only admissible under an exception to the general rule, which excludes all hearsay evidence, we are clearly of opinion, that the court did not err in allowing the evidence to go to the jury.

At a former trial of this cause before the Circuit Court of Hinds county, Moore, Bankston, Coker, Long, M'Mann and others, were examined as witnesses for the petitioners. Their testimony was taken down in writing, and recorded by order of the court. On the last trial, certain portions of the evidence thus reduced to writing, were read to the jury without objection on either side. It is now insisted, that the admission of this evidence was improper and illegal. It is unnecessary for us to express any opinion upon this question. The objections now urged should have been made when the evidence was offered. Having failed to do this, the party complaining cannot now be heard. It has been uniformly held, that the introduction of illegal evidence, if unobjected to, is no ground for a new trial.

Having noticed the objections made to the ruling of the court in reference to evidence offered by the petitioners, we will next consider the exceptions taken to its action in the exclusion of testimony produced by the respondents.

The respondent offered to read in evidence the deposition of Nancy Griffith; to the reading of which the petitioners objected. The objection was sustained, and the deposition ruled out.

There can be no doubt of the propriety of this decision. The interrogatories were addressed, and the commission issued to take the deposition of Nancy *Griffin*. The commissioner took and certified the examination of Nancy *Griffith*. These are distinct and

well known names. There is nothing in the record from which we can infer the existence of a clerical misprision; nor are we authorized to assume that the party suing out the commission intended to have the deposition of the latter and not the former taken.

Certain answers to cross-interrogatories propounded to Alcey Bankton, Ellison Gross, John Price, Hardy Strickland, and several other witnesses, whose depositions were taken in behalf of the petitioners, were, upon the objections of petitioners, ruled out and excluded from the jury.

And the answers to certain direct interrogatories propounded to John Robinson, C. F. Walthal, Ellender Hollander, Mary Calloway, Samuel Clark, John Jones, and many other witnesses, whose depositions were taken for the respondent, were also, upon the motion of the petitioners, ruled out.

The action of the court in rejecting these answers of the witnesses referred to, is made the ground of the next exception which we propose to examine.

The answers of the numerous witnesses or the separate items of testimony thus excluded, are too numerous and voluminous to be noticed in detail, even if it were more necessary to a proper understanding of the legal questions which arise upon the ruling of the court in the premises. But in order to a sufficient comprehension of these questions, we will state the object and general character of the excluded evidence.

The subject to which the whole of the evidence ruled out had reference, was the question, whether Thomas and Demarias Cargill, who lived together, were in fact legally married. The evidence under consideration was designed to disprove the fact of marriage, and thus to counteract the evidence in chief adduced by the petitioners, tending to prove the existence of a marriage between these parties, which was strictly limited to proof of cohabitation; to proof of their conduct towards, and treatment of each other; and to proof of the repute in which they were held by their family connexions.

Regarding the excluded testimony of the respondent, in reference to the question of marriage, in the most favorable light in which it could be looked at, it amounted to evidence that reports

Henderson *v.* Cargill et al.

were current in the neighborhood where Thomas and Demarias Cargill lived, that they were not married, but were living together in a state of adultery; that an impression existed, and the belief prevailed amongst their neighbors, that they were not married, and that in consequence of such reports and belief, they were not visited by reputable persons.

The question to be decided is, whether, in a case of pedigree, where the fact of the marriage of the ancestors of the party is put at issue, evidence of this character is competent to disprove the marriage.

The term pedigree, embraces not only descent and relationship, but also the facts of birth, marriage, and death; and it is sometimes said that general reputation is admissible to prove the fact of the marriage of the parties alluded to, even in cases where pedigree is not in question. Some of the cases cited in support of this doctrine are *Birt* v. *Barlow*, 1 Doug. 171; *Doe* v. *Fleming*, 4 Bing. 267; *Hammock* v. *Bromon*, 5 Day, 290; *Hervey* v. *Hervey*, 2 Wm. Blacks. R. 877. In these cases, and, as it is said by Greenleaf, in all the other cases cited in support of this principle, "the evidence produced cannot properly be called hearsay evidence, but was strictly and truly original evidence of facts from which the marriage might well be inferred." We have not had access to all of the cases cited in the elementary books, or referred to by the reports in support of this doctrine; but however true it may be, that, according to some of the adjudged cases, the fact of a contested marriage may be proved by general reputation, it seems now to be settled, that the principle upon which the law resorts to hearsay evidence in cases of pedigree, is "the interest of the declarants in the person from whom the descent is made out, and their consequent interest in knowing the connexions of the family." And hence the rule of admission is restricted to the declarations of deceased persons, who were related by blood or marriage to the person, and therefore interested in the succession in question." And under this rule it is held, that general repute in the family may be proved by the testimony of a surviving member of it." Greenleaf, Ev. 119, § 103, and cases cited; *Rex* v. *Eriswell*, 3 Term. R. 307; *Gregory* v. *Baugh*, 4 Ran. 711.

It is a principle, resulting necessarily from the doctrine that the fact of the marriage cannot be established by proof of general reputation, that it is not competent to introduce evidence of general reputation, to disprove the existence of the marriage.

If we apply this rule to the question under consideration, the conclusion is unavoidable that the evidence was properly rejected.

We will close this investigation by a notice of the exceptions taken to the charges given at the instance of the petitioners.

The first, third and fourth instructions are objected to. They are as follows:—First. "Proof that a man and woman lived together as husband and wife, if not rebutted, is conclusive evidence of their marriage." Third. "Counter declarations made by such a man and woman, except such as are made under circumstances of peculiar seriousness and solemnity, will not suffice to overturn such presumptions of a marriage; much less will circumstances in the conduct of the parties which merely excite suspicion that no marriage was celebrated;" and Fourth. "Declarations of deceased members of a family are evidence to show relationship and pedigree; reputation in the family is evidence to prove relationship and pedigree; but the jury must disregard all proof of neighborhood reputation, reports and rumors, as to the non-existence of such marriage, relationship, and pedigree."

We perceive no objection to the first instruction. Proof that a man and woman cohabited as husband and wife, is evidence from which a court or jury might infer the existence of a marriage between them; and if unrebutted, would necessarily be conclusive. But if this instruction were conceded to be erroneous, for the reason that too great weight is given to the legal presumption arising from the fact of cohabitation, the error is cured by the third instruction given for the respondent. It is as follows:— "Although it is true that marriage may be legally inferred from cohabitation and reputation, yet, if it appear from the evidence that the acts of the parties were inconsistent with the relationship of husband and wife, and that there was no general reputation recognizing them as such, then the legal inference of a marriage does not arise." These charges, taken in connection, state the rule of

law upon the subject, in at least sufficiently favorable terms for the respondent.

The rule laid down by the third instruction is clearly the law. Where the facts stated in the preceding instruction, to which this one refers, are proved, the law presumes the existence of a legal marriage in all cases, except in prosecutions for bigamy, and in cases of *crim. con.*   And it is settled, by authority, that the conduct of the parties which only excites a suspicion of the non-existence of the marriage, or declarations against the marriage, unless deliberately and solemnly made, will not rebut this presumption. *Hervey* v. *Hervey*, above cited; Matthews, Presump. Ev. 284, 285; Bull. Nisi Prius, 112.

What we have above said, in reference to the incompetency of the evidence offered by the respondent, and ruled out by the court, dispenses with the necessity of any comment upon the exception taken to the fourth instruction.

We have examined, minutely and deliberately, every question raised in the argument at bar.   Our investigation has convinced us that no error, prejudicial to the appellant, was committed on the trial of the issue.   This case was before us on a former occasion, when the decree was reversed, and the verdict rendered, as it is now, for the petitioners, was set aside, and a new trial awarded; for error committed in the introduction of evidence.   After two verdicts for the same party, the case should be a very clear one, in which a new trial would be awarded, upon the sole ground of the preponderance of evidence against the verdict.   In this case, there was a conflict in the evidence, and for that reason we should not reverse the decree on the motion for a new trial, even if there was, in our opinion, a preponderance of the evidence in favor of the appellant; but, as we have above stated, the verdict is sustained by the greater weight of evidence.

Decree affirmed.

HANDY, J., having formerly been of counsel in this case, took no part in this decision.